UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


UNITED STATES OF AMERICA,            Case No. 5:25-cr-173
                                     Cleveland, Ohio
          Plaintiff,

     vs.                             MONDAY, MARCH 30, 2026

DEMAR DAWSON,

            Defendant.


          TRANSCRIPT OF DAUBERT HEARING PROCEEDINGS
      BEFORE THE HONORABLE SOLOMON OLIVER, JR.
             UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Government:        Peter E. Daly,
                           *Assistant United States Attorney*


For the Defendant:         Timothy C. Ivey,
                           Justin J. Roberts,
                           Catherine Adinaro Shusky,
                           *Assistant Federal Public Defender*s



Court Reporter:            Sarah Derbin, FAPR, RDR, CRR, CRC
                           United States District Court
                           801 West Superior Avenue
                           Court Reporters 7-189
                           Cleveland, Ohio 44113
                           Sarah_Derbin@ohnd.uscourts.gov



Proceedings recorded by mechanical stenography, transcript
produced with computer-aided transcription.

**TABLE OF CONTENTS**

PAGE

DIRECT EXAMINATION OF JESSICA HYDE
BY AUSA PETER DALY:                              10

CROSS-EXAMINATION OF JESSICA HYDE
BY ATTORNEY TIMOTHY IVEY:                        65

REDIRECT EXAMINATION OF JESSICA HYDE
BY AUSA PETER DALY:                              97

MONDAY, MARCH 30, 2026

- - -

(Proceedings commenced at 9:10 a.m.)

- - -

COURTROOM DEPUTY: The case before the Court carries case number 5:25-cr-173, United States of America Demar Dawson.

THE COURT: Good morning.

Will counsel for the United States introduce themselves for the record.

AUSA PETER DALY: Good morning, Your Honor.

Peter Daly on behalf of the United States.

THE COURT: Okay.

AUSA PETER DALY: With me at counsel table is Jessica Hyde -- she will be testifying today, at today's hearing -- and Special Agent and Certified Fire Investigator Clay McCausland with the ATF.

THE COURT: Okay. Thank you.

And will counsel for the defendant introduce themselves for the record.

ATTORNEY TIMOTHY IVEY: Good morning, Your Honor.

Timothy Ivey on behalf of Defendant Mr. Demar Dawson, who is present with us at the trial table this morning.

Also with me is Attorney Justin Roberts from our

office and Attorney Cathy Shusky.

And with us is Patrick Eller, the defense expert in this case.

THE COURT:  All right.

You say Eller, his last name?

ATTORNEY JUSTIN ROBERTS:  Yes.

THE COURT:  Okay.  Before -- this is set for a so-called *Daubert* hearing, and this will be a hearing to determine whether the person who has been designated as an expert by the Government, Ms. Jessica Hyde, will be allowed to testify on certain matters.

Before we proceed with that, is it that Mr. Eller -- is Mr. Eller retained to testify in the case?  Or is he just to assist the defense?

ATTORNEY TIMOTHY IVEY:  He's here this morning, Your Honor, for purposes of assisting the defense.

THE COURT:  Okay.  Because at some point down the road, pretty quickly if he's going to testify, we probably need to take care of that too.

ATTORNEY TIMOTHY IVEY:  I'm not sure what you mean take care of.

THE COURT:  Well --

ATTORNEY TIMOTHY IVEY:  Yes, there will be a timely notice, yes.

THE COURT:  Yeah, that's what I mean.

ATTORNEY TIMOTHY IVEY:  Yes.  I didn't know what you meant by that.

THE COURT:  I know.  I wasn't precise.

ATTORNEY TIMOTHY IVEY:  Okay.

THE COURT:  You get my gist.

ATTORNEY TIMOTHY IVEY:  I do, Your Honor. Yes, we do.

THE COURT:  All right.  So Rule 702 really guides our inquiry, and it deals with testimony by experts, and it provides that experts may testify under appropriate circumstances.

And it starts out by saying a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion, or otherwise, if the proponent demonstrates to the Court that it is more likely -- that it is more likely than not that (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and, the -- and the expert's opinion, (d), reflects a reliable application of the principles and methods to the facts of the case.

So that's really the law at large in regard to what

we're trying to decide.

The law is also clear, although the rule I think also spells it out, that the proponent of the potential testimony bears the burden of proof in regard to it, to proving these standards, so that's where we are.

The defendant has filed a motion to preclude the proposed expert testimony by way of a motion in limine, and there has been exchange of briefing in regard to the issues that the Court must determine.  I looked to see whether I could determine the matter on the briefs, and I determined that I could not.

The Government did clarify that it wasn't calling Agent McCausland to testify in regard to whether the admissibility of certain evidence for the Apple phone was appropriate, that they were relying on Ms. Jessica Hyde for that.  Now it doesn't mean that Agent McCausland will not testify in regard to other matters.  They didn't indicate that, that he wouldn't be a witness.  So the record is clear on that.

So that narrows down what we have to decide.

So, mainly, I think the issues that have been raised relate to reliability in the case.  But first thing that has to happen is that a defendant has to be -- not a defendant -- an expert has to be qualified by background and experience in order to give appropriate testimony, and then,

beyond that, we're looking at relevance and reliability.

But the Court has been viewed, described as being a gatekeeper in this regard. So this is not a question of whether an issue in regard to expert gets to the jury or not. That's not the standard. The Court itself has to make a decision up-front on whether this testimony would be admissible. And it's a preponderance of the evidence standard, more likely than not, that it's reliable and that it's reliably applied. So that's where we stand.

So I am ready to proceed. But maybe, before we put the witness on, let's just clarify what's at issue and what's not.

Maybe I'll start with the defense counsel. The burden is on the Government, but I want the defense counsel to very briefly just state what aspect of this they're challenging.

ATTORNEY CATHERINE SHUSKY: Thank you, Your Honor.

I'll address that.

There are two, I think, primary issues, and as I talk, maybe they'll break down to more than two, but two in my mind to start with.

First is Ms. Hyde's expertise with Apple Health data specifically. She clearly has expertise in forensics, but we're curious to delve more into her expertise into this Apple Health data specifically.

Second is the reliability of this data that's in the phone.  We don't dispute that this data is in the phone necessarily, but what we are disputing is what actions can be used to record that data, to make that data, and we think it's unreliable for the Government to offer it as evidence of steps or distance or speed when that data can be made in other ways.

THE COURT:  You're saying when it can be made in other ways?

ATTORNEY CATHERINE SHUSKY:  Correct.

Not necessarily when a person is walking.

THE COURT:  Is that part of the standard, that it -- that if there's another way you can do it, then you can't use a particular method?

ATTORNEY CATHERINE SHUSKY:  Well, I don't think the Government's expert is going to be able to say that this is data that is reliably showing that somebody is moving in the -- that they're walking.  Right?  And that's what the Government is offering it for.

THE COURT:  I understand that.

I was just kind of focusing on when you said it can be made, the point the Government wants to make, can be made in other ways, I just -- I don't think that --

ATTORNEY CATHERINE SHUSKY:  So I think the studies will say shaking the phone, riding in a car, things

of that nature can register steps.

THE COURT:  I understand your point now.

ATTORNEY CATHERINE SHUSKY:  Okay.

THE COURT:  I understand.

ATTORNEY CATHERINE SHUSKY:  So I think those are the issues at hand.

So -- did I miss anything?

(Pause in Proceedings)

ATTORNEY CATHERINE SHUSKY:  Those are the issues, Your Honor.

THE COURT:  All right.  Thank you.

Okay.  Let me go to the United States now.

Mr. Daly.

AUSA PETER DALY:  Yes, Your Honor.

The Government is prepared to have Ms. Hyde testify. She will cover, obviously, her own experience, education, her training, her expertise in the field of forensic data analysis, including Apple Health data.

She'll also testify about her knowledge of the studies that have been done on the reliability of that data as it pertains to the data that was used in this case or the types of data used in this case.

I would note that this idea that -- and I know that the defense is relying on the idea of being able to manufacture these data points in some other way artificially

as part of their reliability argument.  I would submit to the Court, I think it goes more to the weight of the evidence.

I mean, they can argue that the data was created artificially in some other way, a person shaking a phone, you know.  There's other evidence in this case as to what Mr. Dawson has said he was doing at the time that these data artifacts were created, so I think those -- they've identified the issues.  We're prepared to address them today.

THE COURT:  All right.  Thank you.

Let's have Ms. Hyde take the stand now then.

Go ahead and step up.

THE WITNESS:  Thank you, Your Honor.

May I address the fact that there's no chair?

(Pause in Proceedings)

(Witness sworn/affirmed)

THE WITNESS:  I so affirm.

THE COURT:  You may be seated.

All right.  Mr. Daly, you may proceed.

AUSA PETER DALY:  Thank you, Your Honor.

**DIRECT EXAMINATION OF JESSICA HYDE**

**BY AUSA PETER DALY:**

**Q**    Good morning, Ms. Hyde.

**A**    Good morning, sir.

**Hyde (Direct)**

11

**Q** Would you please state your name and spell your last name.

And is there a microphone up there?

**A** There we go.  We've got the whole area here set up.

(Pause in Proceedings)

**A** My name is Jessica Hyde.

My last name is spelled H-Y-D-E.

Hotel.  Yankee.  Delta.  Echo.

**Q** And where are you currently employed?  Or what business are you engaged in?

**A** I'm currently the founder of Hexordia, which is a digital forensics company.

And I'm also an adjunct professor teaching mobile device forensics at George Mason University.

**Q** All right.  Let's talk first about Hexordia.

Can you describe the type of work that Hexordia does.

**A** Sure.

Hexordia is engaged in a couple of different lines of digital forensics work.  We do training, where we train federal and state and local law enforcement in digital forensics, specifically in the areas of mobile forensics, data structures, Mac forensics, IoT forensics, et cetera.

We also do active casework, such as this.

We also are a government contractor providing digital forensic services in the DOD and intelligence community

**Hyde (Direct)**

spaces.

Additionally, we are a reseller of some digital forensics tools, including some of the ones used in this case.

**Q**     And you said you're the founder of Hexordia?

**A**     That's correct.

**Q**     When did you found that company?

**A**     Well, I established the company legally in November 2019.  However, I did not start operations until June 27th, 2021.

**Q**     And what is your primary role at Hexordia?

**A**     Well, I do quite a few things.  I both develop, teach, and train and do active casework.

Also, on a couple of government contracts, I serve as a SME, so I'll go in as needed on those government contracts to do digital forensic analysis and help in cases where they might need some deeper or higher-level expertise.

**Q**     You used the term SME?

**A**     Oh, sorry.

Subject matter expert.

I apologize for the acronym usage.

**Q**     That's all right.

Do you have other employees who work for you at Hexordia?

**A**     I do.

**Hyde (Direct)**

**Q**    Describe that, please.

**A**    So I have several digital forensic examiners, as well as mobile -- mobile exploitation analysts.  I do have, you know, an operations team.  But I also have digital forensic trainers.

So we have several people who do digital forensics professionally -- former law enforcement, current law enforcement -- as well as examiners who have come from the corporate sector and then joined us.

**Q**    And then, just very basically, what is a digital forensics examiner?

**A**    A digital forensics examiner is somebody who provides acquisition, analysis, and reporting on digital evidence, any kind of digitally stored media.

**Q**    You said you're also an adjunct professor at George Mason University?

**A**    That's correct.

**Q**    How long have you been with George Mason University?

**A**    Well, it's ten years now.

And I teach the mobile device forensics course, and I author that course, in the master's program, which is currently a master's in digital forensics; previously, it was titled the master's program in computer forensics.

**Q**    Prior to your work at Hexordia -- well, let me back up.

14

**Hyde (Direct)**

I'm going to show you on your screen what's marked as Government Exhibit 2.

Do you see page 1 of Exhibit 2 on your screen there?

**A**      Yes, I do.

THE COURT:  Just a moment.

I think everybody's screen came up but mine.

(Pause in Proceedings)

THE COURT:  He's got it for me.

**BY AUSA PETER DALY:**

**Q**      All right.  Do you recognize Government Exhibit 2?

**A**      Yes.  This is my curriculum vitae.

**Q**      All right.  And we see at the top there your work with Hexordia?

**A**      That's correct.

**Q**      And at George Mason University?

**A**      Correct.

**Q**      Have you always taught the same course at George Mason?

**A**      Correct.

I've always taught the digital -- I've always taught the mobile forensics course, mobile device forensics.

**Q**      And it may be self-explanatory from the title of the course, but what does that course cover?

**A**      Absolutely.

That course covers the extraction and analysis of data

**Hyde (Direct)**

from mobile devices.  Currently, the course -- the course is updated every single term, as we're in a rapidly changing field, so I do testing and writing of that course.

So in today's course, we're going to -- actually, I teach on Monday nights.  My class isn't getting taught tonight, because I'll be driving back to Syracuse.  They have to watch my testimony for course tonight and answer some questions on that.

I figured that was appropriate since the reason I'm not teaching is because I'm here.

THE COURT:  How will they watch your testimony?

THE WITNESS:  They're watching prior testimony of mine that's on YouTube.  Not today's testimony.  No.  No. No.  Prior testimony.  They're analyzing my testimony.  It's great.

So that course includes a variety of hands-on labs, as well as lectures, as well as analysis assignments.  Those labs cover everything from how to extract data from phones to actually doing analysis of unsupported apps, doing testing, validation, and looking at artifacts that are known, as well as artifacts that are not yet known.  In the world of mobile devices, there's more unknown than known, so there's a lot of testing and validation and analysis to be done.

We also dive deep into data structures, including SQLite, PLIST, as well as LevelDB, Android Binary XML, and a variety of other data structures that are on devices.

**BY AUSA PETER DALY:**

**Q**    And that's a course that you authored and continually update as we go; right?

**A**    That is correct.

A class that I author and have to update.  It's enjoyable every fall when the new operating system versions are released and I have to update the course and -- because it's about the section I'll be teaching two weeks later, so a lot of testing and validation goes into that.

**Q**    All right.  Prior to your work at Hexordia and your time at George Mason, what other employment did you have in the field of digital forensics?

**A**    I've had several roles.

I was the director at Magnet Forensics, digital -- director of digital forensics at Magnet Forensics.  It's a lot of repetitive words there.

And there, I was responsible for a couple of different things.  I actually worked with the product team doing research and analysis of artifacts before they went into the systems.

I per -- I gave lectures on my research worldwide, presentations at conferences.  I met with customers to get

17

**Hyde (Direct)**

an understanding of things that they felt were missing in their tools, and provided technical expertise to assist people with their cases when things either weren't as expected or there were issues with the tooling.

I created a lot of technical processes for customers to follow, and gave a lot of input in the development of the parsing, which is the reading of the digital data and translating it into human readable content, understanding what the data is that's stored.  I did a lot of research and assistance with the product team on that, being the engineers.

**Q**     And you've used the term artifact?

**A**     Uh-huh.

**Q**     What is an artifact in digital forensics?

**A**     An artifact in digital evidence, in digital forensics, is a trace we find, a digital trace, so bytes left over from something that happens.

A good analogy would be if you're walking down the street, and you walk through mud, you're going to leave a footprint.  That's a trace evidence.

Likewise, when you're doing things on your phone or your computer or an Internet of Things system, as you do things, the device tracks information and that leaves residual artifacts.

**Q**     And prior to Magnet Forensics, did you have any other

employment in the digital forensics field?

**A**     Yes.

As you can see here, for one year, I did teach at Champlain College as an adjunct professor, also a mobile forensics course.  I was not the author of that course, and that caused me a little bit of frustration.  I didn't necessarily always agree with the up-to-dateness of the content, but it was good content nonetheless.  So I taught there for one year.

Prior to that, I performed digital forensics as a senior mobile exploitation analyst and the team lead for Basis Technology, which was at the DOD -- I'm sorry -- the DIA's National Media Exploitation Center, also called NMEC.

This is where, Your Honor, devices come in of critical nature for the intelligence community.  Think devices coming from overseas.  Think all of -- all of the bad guys.  You know, the bin Laden media, it's known publicly that that was looked at there, as well as other media.

So I did mobile forensics there for close to three years.  I led their mobile exploitation team and worked all high-pri intelligence cases.

I have more.  Do you want -- did you want further?  Or did you have a question there?

I'm sorry.

**Q**     We will go further, but just a moment.

**Hyde (Direct)**

**A**      Yep.

**Q**      In several of these positions that you've talked about, specifically with Magnet and now with Basis Technology, you've talked about mobile digital forensics?

**A**      Correct.

**Q**      Can you make a distinction between mobile digital forensics and the wider field of digital forensics?

**A**      Absolutely.

The wider field of digital forensics would include things like network forensics, looking at packets going through wires, like when you're using the internet, looking at things such as computers and hard drives and other -- more PC servers, laptops.

I tend to have spent my career specializing in mobile devices and Internet of Things devices. So at Basis, I did work both mobile and IoT.

And when I say Internet of Things devices, I mean everything from drones to buoys to vehicles to TVs, all of that kind of data that isn't traditionally a computer.

But in that role, everything from feature phones to smartphones. Sometimes bad guys use throw-away phones in some of their work, so there was a lot of that. But also looking at GPSs, counterfeit devices, wearables.

So I've done a lot of analysis there, particularly on a variety of different smartwatches, Fitbits, Apple devices,

et cetera.

**Q**     All right.  Moving on from Basis --

**A**     Oh, my --

**Q**     -- your next entry here.

**A**     Yeah.  I worked for EY, otherwise known as Ernst & Young.  Actually, most of my trips to Cleveland previously were for that.  They were headquartered here.

But EY, I worked -- that was my stint in the corporate sector.  To be honest, I didn't really enjoy it.  It was a lot of -- I did do both mobile and some traditional computer forensics there, but it was a lot of money cases and they were, ultimately, less technically interesting.

A lot of the stuff wasn't -- didn't require as deep of an analysis, and I really prefer doing things that need more technical depth and exploration, so I went to NMEC from there.

**Q**     All right.  We see here you were employed for a time at American Systems in Lorton, Virginia?

**A**     Yes.

So there, I did exploitation of IEDs, improvised explosive devices, as a contractor for the Terrorist Explosive Device Analytical Center, otherwise known as TEDAC.  This is the government agency that does reverse engineering of improvised explosive devices, or IEDs.

I was there during the period where there was still a

lot of IEDs of unknown origin coming in from Iraq and Afghanistan.  And basically, my role was to exploit those and figure out how they worked.  A lot of those devices are connected to mobile phones as the triggers.

And so, I did reverse engineering of the entire improvised explosive device's circuitry, how they worked, wrote reports on that, as well as extracting data from mobile devices, including mobile devices that were post blast, meaning they were in pieces.

**Q** You had experience in the United States Marine Corps?

**A** That's correct.

I served in the Marine Corps for just over six years, for six years and ten months.  I was an avionics man fixing the Harrier aircraft.

**Q** And when you say fixing the aircraft --

**A** Uh-huh.

**Q** -- what type of work did you do?

**A** Oh, great question.

So what I would do is I would -- if a jet came back with what's called a gripe or a technical issue, something didn't work, the pilots would come back, they would report that, I would go out and test and troubleshoot the system, shoot wires, test for connectivity, go through wiring diagrams, schematics, figure out what the issue was with the aircraft, and repair it, typically either by wire repair or

running a new cable or actually changing out an electronic component and testing of those components.

Q    And can you describe for the Court your educational background.

A    Sure.

I have a bachelor's of science in electronic engineering technologies from ECPI.  I did a great deal of that while I was on active duty, so I had a lot of different schools leading to that bachelor of science.

And then a master of science in computer forensics from George Mason University.

Q    And you obtained that master of science from George Mason in 2014; correct?

A    That's correct.  2014.

Q    And since then, you've worked in the field of digital forensics?

A    Correct.

I've been working in the field of digital forensics since 2010.

Q    Do you hold any licenses or certificates in the field of digital forensics?

A    Yes, I do.

I have the NW3 Certified Cyber Examiner, 3CE.

And the GIAC Certified Forensics Examiner, the GCFE.

As well as some older Cellebrite certifications.

**Hyde (Direct)**

My Magnet Certified Forensic Examiner certification has expired.

And I actually hold an FCC GROL License, which is for radio operations and radio analysis. That came from my time in the Marine Corps.

**Q** All right. So let's talk about some of these.

The NW3C Certified Cyber Crime Examiner --

**A** Uh-huh.

**Q** -- what is that license?

**A** So that license -- or that certification, not a license, is an evaluation of your credentials, so your experience, your -- what you currently are doing, your education, your testimony, and they have a calculation they take together or they validate and vet all of those pieces of information. You submit your degrees, your years of practice, types of cases you've worked, et cetera. And based on a scoring system that they have, you are eligible to obtain the Certified Cyber Crime Examiner certification.

**Q** And what does 3CE indicate?

**A** 3CE is what they're saying because it's certified cyber crime, so that's the three Cs, and then the E for examiner. So that's the abbreviation.

That NW3C, which is the National White Collar -- oh, I forget -- now I'm going to forget their three Cs -- National White Collar Cyber Crime Center, but I feel like I added an

**Hyde (Direct)**

extra C there.

**Q** That's all right.

GIAC Certified Forensic Examiner.

**A** So GIAC Certified Forensic Examiner is a certification that's obtained after passing a test in digital forensics. And that is a pretty standard baseline certification for a lot of roles, including some of the government contracts that I'm on.

That certification requires you to have taken a course, in this instance one of the courses offered by SANS, and there is a possibility of obtaining it without that, you can do a waiver, but I took the course. And then, you sit for that exam. It has to be within such a period from the class.

And then, to maintain that certification, you have to demonstrate enough continuing professional education, or CPEs.

**Q** I'm not going to ask you to go through all of them, but have you received a number of awards and commendations for your work in the field of digital forensics?

**A** Yes. I have received some awards for my work in digital forensics.

The Forensic 4:cast Awards are community-driven awards. I did get one for DFIR Article of the Year, which was an article that I had coauthored with others regarding

**Hyde (Direct)**

digital mobile forensic evidence.

There are also several Capture the Flag contests that I've gotten, placed in.  Those are competitions on digital forensics competency.  Nowadays, I just author those.

And I had -- I would like to say that those two Certificate of Appreciations that don't have much information, in May of 2015 and November 2014, have a lot of personal meaning because those were very, very high-priority intelligence cases where, you know, lives were saved by that work, so I'm really, really proud of those; although, I can't disclose what they're about.

**Q**     And I won't ask.

**A**     Fair.  I'd refer you back to the DIA.

**Q**     You have a number of publications that you've authored or coauthored in the field of digital forensics; is that right?

**A**     That's correct.

**Q**     And again, they're listed in Government Exhibit 2.

Are these -- under the publications section, these are all publications that you have personally participated in creating?

**A**     Correct.

**Q**     Are you a member of any professional associations --

**A**     Yes.

**Q**     -- or affiliations?

**A**      Yes.

I am a member of SWGDE, which is the Scientific Working Group on Digital Evidence, which authors -- it's a SDO, or a standards elevation organization, that authors standards on different digital forensics topics.

I am also the chair of DFIR Review.  DFIR Review provides peer review of blogged articles.

In other words, a lot of practitioners, instead of going through the academic peer-review process -- which having done it and having been a former editor, associate editor of a peer-review journal, that can take a very long time, and a lot of these things need to be out there quickly, as we're learning, so a lot of practitioners will put blogs out on the internet.

And what DFIR Review does is we provide a way to conduct peer review of those blogs.  And so, I'm both the founder and the chair of that project, because I recognize the criticality of peer review of those items so that they could be used in court proceedings.

I'm also a member of the NIST, so National Institute of Science [sic] and Technologies, OSAC, Organization of Scientific Area Committees, for Forensic Science in their digital evidence subsection.  I have been -- I was an affiliate in 2021, and I've been a member since then.  And this is the other organization that writes standards in

27

**Hyde (Direct)**

digital forensics under NIST.

I'm also a member of the HTCIA.  And normally, just being a member wouldn't be that exciting, but I've actually served up to the level of First VP at the international organizational level of volunteering and giving back to that organization, which is the longest standing community organization in digital forensics, being around for 41 years, about since the beginning of our field.

I haven't been part of it for 41 years.  I am younger than that.

**Q**     All right.  We have a number of these listed in Government Exhibit 2.

Are there any others of these professional affiliations that you'd like to highlight?

**A**     Yeah.

I was previously, for the *Forensic Science International: Digital Investigation* journal, which I would say is the primary academic peer-review journal in our field, I've been a reviewer in multiple years.  I served on the editorial board for many years, about four or five years.  And then, I was an assistant editor for two years.

**Q**     Now you've used the term peer review --

**A**     Uh-huh.

**Q**     -- what does that mean?

**A**     Peer review is the process of verifying that work of

**Hyde (Direct)**

another is suitable for publication and is true and accurate.

So there is -- we do peer review, like, internally, so my report was peer reviewed by another examiner on my team, because peer review is how you check for mistakes, you check for biases, et cetera.

But in the academic field, and with DFIR Review, what this means is when someone authors an article, they submit it to an organization like DFIR Review or to a journal like *Forensic Science International* or AAFS, the American Academy of Forensic Sciences, for their journal, *Journal of Forensic Sciences*, JFS.

You would submit your written paper, academic paper, or in DFIR Review, a blog, that demonstrates the processes you found, the evidence you found, et cetera, and the peer reviewers would go through and provide a peer review.

Now there are different types of peer reviews that can be done. It could be validating that the methodology is sound, methodological review. It could be that you request the dataset from the author of the dataset and you review their data along with the content. Or the third one is you could create your own test data and apply it.

And the reason that you would do something like a methodological review is some -- is not everything can be tested by someone else. Let's say it's a paper on satellite

forensics, which is a thing, right, but I don't have a satellite, so I couldn't go and create my own data, and in -- sometimes that data can't be shared either because of privacy laws or NDAs or other such things, so sometimes something would go under a methodological review.

But a peer review is your peers, other people with the appropriate industry experience, going through and validating.  And in the peer-review process, comments are made, they're given back to the authors, and then the authors take time and go back through.

And I've -- I've served on both sides of this, having published academic papers myself, with coauthors, and while also being a peer reviewer, as well as at the level of facilitating the entire process as I did as an associate editor for *Forensic Science International: Digital Investigations* journal and as I do as the chair of DFIR Review.

THE COURT:  Mr. Daly, I don't mean to cut you off at all because I know this background is very important, but, fairly soon, move to the matters at hand in terms of her background and experience to do the --

AUSA PETER DALY:  That's fine.  And that's where we're moving now, Your Honor.

THE COURT:  Okay.

**BY AUSA PETER DALY:**

**Q**    Ms. Hyde, I want to talk now about your work in the case before the Court today.

Were you asked to provide forensic analysis of certain data from an iPhone in this case?

**A**    Yes.

**Q**    And what type of data were you asked to look at?

**A**    I was asked to look at calls, SMS, and Apple Health data in a period on a specific date for a specific time period.

**Q**    How was the data provided to you for analysis?

**A**    We received a drive that had all of the information on it, the forensic image, that was sent to our office.

**Q**    And when you say the forensic image, what type of forensic image did you receive?

**A**    So we received a full file system image that had been created with a GrayKey forensics tool, which is from Magnet Forensics.

And that forensic image was received, two copies were made, we make a gold copy and a working copy, and the original evidence is in our safe.

**Q**    And --

**A**    Not the original evidence, to be clear.  The copy that was sent to us, I clarify.  Thank you.

**Q**    All right.  And the full file forensic image -- excuse

**Hyde (Direct)**

31

me -- full file system forensic image, is that the data -- or does the data in that format allow for you to do a forensic analysis?

**A**    Correct.  The data in that format allows for me to do a forensic analysis.

**Q**    How did you go about performing your analysis in this case?

**A**    In this case, I extract -- I took the copy of that evidence, the first thing you do is you hash that evidence, you ensure that the hash value matches.

And then, because that hash value matched, we knew that we had a good copy of the evidence that matched what was on the document provided, the PDF document from the extraction.

Then, from there, I process the evidence with a variety of digital forensics tools, including Magnet AXIOM, Cellebrite UFED, a tool called iLEAP, a tool called HEART, which is written by the defense counsel's expert witness's company, so that's kind of cool.

And what else did I run on it?  ArtEx, which is another forensics tool.

So processed it in those tools, and then, after processing, looked at the relevant data, both in those tools and then did deeper analysis by extracting those databases and their associated files and then doing further analysis

**Hyde (Direct)**

on those databases using other forensics tools that are specific for looking at those data structures.

**Q**     And when you talk about forensics tools, we're talking about software and programs that are used to analyze the data; is that right?

**A**     That's correct.

**Q**     And the tools that you have mentioned here today, and that you used in your analysis in this case, are those tools that are regularly used in your field?

**A**     Correct.  Yes.

**Q**     And are they tools that you -- are all of them tools that you are familiar with in your work?

**A**     Yes.

**Q**     I want to talk specifically about the Apple Health data that you looked at in this case.

Broadly, what is Apple Health data?

**A**     Apple Health data is information that the phone retains from a variety of sensors that pertain to things that Apple cares about tracking for the purposes of health.

So those things include your activity level.  They could include -- well, it depends on if the phone is paired with an external sensor, such as a watch or a Fitbit.  And in this case, there wasn't.  We can tell when -- in the databases that there wasn't.  But that data as well.

So these variety of sensors tell you things about the

health of the person, quote/unquote.  And also, they're health databases, so they're going to track things like movement, steps you take, heart rate, if you have an associated watch, flights that you climb -- well, I'm sure we'll go into flights climbed.  Flights climbed does not necessarily mean flights climbed, but that's what it's called in the data structure.  As well as other personal data, as well as things such as what devices were giving information to Apple Health.

Third-party apps can also be feeding information into Apple Health, let's say you're using something like Strava or a running app.  In this instance, those weren't present on the device, however.

**Q**    Where in the iPhone file system is the health data located?

**A**    /private/var/mobile/library/health/healthdb_secure. sqlite and healthdb.sqlite.

There's another location in the location D: directory called the encrypted-cache-C database.

And those are the primary sources that we'd use to look at things like -- well, health is in those two health databases, but the encrypted-cache-B, which is really stored in Apple's location area for storing data, geolocation, but there is -- that data is also there.

**Q**    All right.  So let's talk first about the health

**Hyde (Direct)**

databases.

I think you termed them both SQLite databases?

**A**     They're both SQLite databases.  Or SQLite.  Both pronunciations are acceptable.

**Q**     All right.  And did you obtain data in this case from the SQLite or SQLite databases for your analysis?

**A**     Yes.

**Q**     What is the SQLite database?

**A**     A SQLite database is a structure that stores data. It's kind of like an Excel spreadsheet on steroids, and it has multiple different sheets, they're called tables.  And they provide a variety of information that's stored in them, kind of like the rows and cells in an Excel spreadsheet.

**Q**     And is the SQLite a reliable database or reliable source for data for forensic analysis?

**A**     SQLite databases are a data structure that mobile phones use to store data, and the reason that that database is used is because of its known reliability.

**Q**     And can you explain that.  How is it known for reliability?

**A**     It's known for reliability because of the way that the database structure works in terms of writing the data.

There's two different versions.  There is an older version and a newer version.  But basically, in either version, the data is stored in a log and then that -- it's

duplicated for transaction.  So there is a log that has the information and then it goes into the database, or it goes into the database and simultaneously written to the log.  That's the newer and the older version's differentiation.

However, in a SQLite database, the criticality is that it's reliable because there is this write-ahead log.  So if a corruption happens, the write-ahead log can -- on the reopening will put the data into that database so it's all live.

**Q**     All right.  So even in the event of a system failure on the device or sort of a -- some sort of corruption of data, there's essentially a fail-safe, is that what you're saying?

**A**     There is a fail-safe.

Now, of course, in any data structure, things can be corrupted and things can happen.  I'm not saying that it's foolproof.  I'm saying that it has a high level of reliability because of the way the data structure works.

That's correct.

**Q**     And is the SQLite database, for those reasons, widely used in digital forensics analysis?

**A**     It's widely used in digital forensics analysis because it exists, not so much because of its reliability.

It would be chosen by developers based on reliability.  As a digital forensics examiner, I am looking at it because

36

**Hyde (Direct)**

that is where data, in some instances, is written and stored.

**Q**    All right.  So -- but a company like Apple would use that database because it reliably stores -- captures and stores data; is that right?

**A**    Correct.  That they can access and reutilize, yes.

**Q**    Now you mentioned two different SQLite databases, one secure and one nonsecure; is that right?

**A**    Well, not that the database is secure, not secure. The title of it is healthdb_secure, and one is healthdb without secure, both with the extension SQLite.

**Q**    All right.  And what is the difference between those two databases?

**A**    So the healthdb_secure.sqlite is the one that stores information that is very, very personal.  So this would include things like your heart rate, your activity, steps taken, floors climbed, et cetera.

The healthdb.sqlite stores ancillary information that's less personal in nature.  For example, what would be stored there is what other devices are connected to that health information.  So it -- for example, it could be that you've had multiple phones, and it could be that you have a phone and two watches, or watches over time.  It shows every device that's given sensory input to that database.

**Q**    And for your purposes of your analysis in this case,

**Hyde (Direct)**

which of those databases did you use?

**A**      Well, I did verify that there weren't any watches in the healthdb.sqlite.  But most of my analysis focused on healthdb.secure.sqlite -- healthdb_secure.sqlite.  Sorry.  I added a dot.

**Q**      You also mentioned a cache-encrypted c.db database?

**A**      That's correct.

**Q**      What is that?

**A**      The cache-encrypted c.db database is another data store that includes information, including step count and changes in elevation; however, that database is limited in time.

So when I checked both the step count and the data pertaining to flights climbed in that database, the data didn't go back that far.  Right?  It went back to October, not through August.  So its data retention period is different, so we couldn't utilize it in this instance.

But that database is more focused on geolocation, but it still takes into account that information and stores it.

**Q**      All right.  So even if that cache encrypted database were present on the phone, would that have been the primary source of data for your analysis?

**A**      Oh, it was present.

**Q**      All right.

**A**      It just didn't have the correct -- it didn't have the

**Hyde (Direct)**

time frame that was necessary for analysis.  It would be a corroborating artifact.  Health -- the healthdb_secure.sqlite is the primary source for this data.

**Q**    All right.  Have you examined Apple Health data previously as part of a forensic analysis?

**A**    Yes.

**Q**    Can you estimate how many times or how often you looked at that type of data?

**A**    I look at that kind of data pretty frequently.  I have analyzed it in cases, both cases that have gone to trial and not gone to trial.  But I also teach this topic, so I test it and look at that data and incorporate it into that.

So I analyze it both for cases, as well as for non-cases, so it's something that I look at regularly.  I teach it multiple times of year.  I'm digging into the data type multiple types of year.  I create my own datasets for teaching and for those Capture the Flag events that we put on.

So I'm regularly immersed in both looking at, testing, validating, and analyzing this data.  It's very commonly used.

**Q**    And is analysis of Apple Health data part of the course that you teach at George Mason University?

**A**    It is.

**Q**    And you said you create your own datasets of that type

**Hyde (Direct)**

of data.

Can you explain that.

**A**     Yeah.

So I have phones that have fake accounts on them, they're entire personas that are built, and then you do your testing with that.  You create datasets that I can use to teach or I can use in Capture the Flags.

And so, basically, you pretend you're that person and you document everything you do with that phone.  So -- and, you know, walked from, you know, office to bathroom, and you document it.  Right?  Went to -- so you document location.  You document every time you turn on the phone, every time you rotate the phone, every time you pick up the phone, every time you enter an app, anything you type.

So I have sheets and sheets with documentation of creation of data for datasets.  And this is what I use to teach.  And then we go through -- we also use public datasets to teach that are also documented, but because I'm constantly creating datasets for new images, and Apple Health data is so prevalent, it's something that's part of the normal routine of creating content for courses.

**Q**     And based on that experience, specifically in creating and testing datasets, as you described, have you found the Apple Health data to be an accurate metric for keeping track of things like steps and distance?

**Hyde (Direct)**

**A**    So for steps, very, very accurate.

For distance, distance demonstrates that there was movement at that time, but I don't necessarily think that all the distances are completely accurate.  There's definitely variation and differentiation.

However, the time range -- so, like, it really doesn't do well determining necessarily walking or running.  I'm a slow runner, so it definitely doesn't catch my running.  But the differentiation in -- in distance is sometimes off; however, those timestamps fairly accurate -- or accurately represent that movement of the device occurred in that time.

Now, I will be clear, it's movement of the device.  So the device could be moving in a variety of ways, and -- including being held.  So when you have distance moved with steps, that actually really demonstrates something.  But those distances I would not say are as accurate as would be preferable.

**Q**    And we'll come back to that in a moment here.

But aside from your own creation of data and testing of that data, are you aware of any studies regarding the accuracy of Apple Health data?

**A**    Yes.

**Q**    And can you tell us -- you've referenced some of those studies in your report.  Let's start with the Goldberg study in 2019.

**Hyde (Direct)**

**A**     Okay.

**Q**     I'm showing on the screen what I will mark as Government Exhibit 3.

And when I say the Goldberg study, this is the study I'm talking about.

Are you familiar with it?

**A**     Yes.

**Q**     And have you read this study?

**A**     Yes.

**Q**     And can you tell the Court what this study indicated about the use and accuracy of Apple Health data.

**A**     So this study -- and I will preface, this one is not peer reviewed -- is from Barak Goldberg, who is a researcher at Cellebrite who creates a tool that parses this data, and what he was doing was looking into both data as connected to a phone and data as not connected to a phone, and demonstrating that there was value, forensic value to the information that could be recovered from the Health application, and that's the data that's stored in the healthdb_secure.sqlite that we've been referencing, and that there are timestamps and locations that can be attributed, as well as step counts, based on data there.

And that it would vary between using a watch and not using a watch, but that the data is still present even without a watch.

**Hyde (Direct)**

**Q**     Was there anything in the Goldberg report to indicate, one way or the other, the accuracy of Apple Health data?

**A**     In his conclusion, Goldberg says that this is relevant data, and that it is reliable, specifically in the steps.

**Q**     All right.  Moving then to a 2019 study by -- is it van Zandwijk?

**A**     Yes.  By Jan Peter van Zandwijk.

**Q**     And Abdul Boztas.

        Are you familiar with this study?

**A**     Yes.

**Q**     All right.  And I'm showing you on your screen what I'll mark as Government Exhibit 4.

        Have you read this article?

**A**     Yes.

**Q**     Yes?

**A**     Yes.

**Q**     And can you tell the Court, what were the authors looking at in this study?

**A**     So in this study, the authors are specifically looking at determining if the step count and distances are accurate.

        This is a peer-reviewed study that was published in *Forensic Science International: Digital Investigation*.  And this is a thorough study with specific distances that were covered, multiple trials in multiple situations.

        So they did phone in chest pocket, phone in hip

**Hyde (Direct)**

pocket, phone in trouser pocket, phone in hand, phone in hand held still, met -- trials while running, trials while walking, and they recorded all the information from the different participants, including both male and female participants, of varying heights, and recorded all of their steps, actual distances, and then compared it to the data stored in the healthdb.sqlite.

**Q**     And --

**A**     Oh, they also came up with an error rate regarding -- an absolute error rate regarding the steps and found it to be between 95.8 and I believe 98.5 percent accurate, and then a greater variability in the distance, which corroborates my non -- non-peer-reviewed findings but my typical analysis findings based on my own testing of the distance being off.

I will note that my monitor did go out.  I don't know if that was intentional.

**Q**     I think all of them have gone out.

(Pause in Proceedings)

**Q**     Okay.  Is it back?

**A**     It's back.

Thank you.

**Q**     All right.

**A**     And so, it does note this error rate.

And the conclusion of the article is that there is a

44

**Hyde (Direct)**

high reliability on step count, and a lower reliability on measured distance, however, still an indicator of movement.

**Q**     All right.  And in fact, when we look at the abstract of this peer-reviewed article in Government Exhibit 4, we see a statement from the authors:  For five subjects, we varied carrying location.  They talk about the methodology. They say:  Steps registered by the iPhone Health app agree very closely to those measured manually with an average error of about two percent.

Is that right?

**A**     That's correct.

That's that AAE I was talking about with the absolute error rate being that 95.8 to 98 with that deviation of two percent.

That's correct.

**Q**     Okay.  So, fair to say, highly accurate when we look at the steps registered by the iPhone and the measured manually?

**A**     That's correct.

**Q**     And as you testified a few moments ago, based on your own experience, the reliability -- or the accuracy of the registered distance did have some additional deviation?

**A**     That's correct.

And the paper indicates that that's 30 to 40 percent deviation, which is significant.  I would not consider that

45

**Hyde (Direct)**

distance to be accurate just because it's read there.  But again, it's indicative that movement occurred at that time.

**Q**     All right.  But these authors also talked about the usefulness for forensic purposes of distances even with that 30 to 40 percent deviation from true value; is that right?

**A**     That is correct.

**Q**     And they talked about the ability to use the distances -- even if that deviation exists, to use the distance data when trying to differentiate between two possible routes of travel or two possible activities?

**A**     That's correct.

And you also have to -- you also can apply those deviations to the measured distances.  Right?  So you could say this distance was 1.2 miles -- although it would be given to you in metric, we'll speak in -- we'll speak in imperial -- 1.2 miles, and there's a 30 to 40 percent variation, so you could come in 40 percent and go out 40 percent and say this is the range of travel.

**Q**     And when these authors talk about using that distance measurement to make a probability statement -- in their words, to make a probability statement about different routes that may have been traveled in a case -- can you explain what they were talking about in this study.

**A**     Absolutely.

So you're going to be able to use that distance, even

**Hyde (Direct)**

though it may be less accurate, if it is that variance excludes that distance, one of the routes -- you know that the route has to be the one that fits in that new distance when you apply the deviation to both sides.

Q    All right.  So, for example, if we have a person who -- forensic data aside -- a person is alleging that they walked, you know, a distance of 20 meters, let's say, and we have Apple Health data that shows, even with the 30 to 40 percent deviation, a far greater distance than 20 meters, how is this data, even with the deviation, useful in that circumstance?

A    Exactly.

So in that situation, you would say that the distance walked in that period was at least what the minimum is of the recorded distance, minus the 40 percent, because then you're taking into account the deviation that's been attributed in research and study.

Q    Looking now at what I will mark as Government Exhibit 5.  This is the Whiffin study from 2025.

Are you familiar with this?

A    I am.

Q    And is this a peer-reviewed study?

A    This is not a peer-reviewed study.

Q    All right.  Can you tell us what this Whiffin study in 2025 was looking at.

**Hyde (Direct)**

**A**    So Ian Whiffin looked at both the healthdb_secure.sqlite and the cache-encrypted c.db to see if the steps and movement would be affected by things such as riding in a vehicle, shaking the device, throwing the device, how those would affect the recordings of steps, et cetera.

The first part of the article actually talks about the accuracy and confirms, like, it's the control set, where he's taking those steps under normal condition with a variety of devices.

Of note, this study does test with a phone running iOS version 18.1, which was of particular relevance.  The phone in the case before us is running iOS version 18.0.1.

And this helps demonstrate that there weren't significant changes to the database from the previous studies that would make this not reliable information in the instance of the case at hand.

**Q**    All right.  So let me pause you there --

**A**    Sorry.

**Q**    -- because I think that's an important point, but I think it's a lot to take in at once.

**A**    Sorry.

**Q**    So the earlier studies that we've talked about --

**A**    Uh-huh.

**Q**    -- those used operating systems on iPhones earlier

than, let's just say generically, 18?

**A**     That's correct.  Because they were published before iOS 18 was relevant.

        This paper is from June 2025, so it was able to test on a more relevant operating system to the time period in this case, which is August of 2025.

**Q**     All right.  So the operating system analyzed in the 2025 Whiffin article, is actually more up to date --

**A**     That's correct.

**Q**     -- than the version of the operating system on the defendant's phone that you analyzed?

**A**     That's correct.

**Q**     And the significance of that, to your analysis, is what?

**A**     Is that there hasn't been a grandiose change where this data became inaccurate in newer versions of iOS.

**Q**     And you would expect that if the iOS 18.1 study found some great discrepancy between it -- its data and the earlier operating systems, that would have been noted?

**A**     Correct.

**Q**     Are you aware of anywhere that it's noted that there has been some major shift that would affect the accuracy or -- excuse me -- would affect the -- your ability in forensics to rely on the information from the earlier studies?

**A**      Can --

**Q**      You're going to ask me to repeat it, and I don't know if I can because it was very convoluted, but I will try.

Aside from the Whiffin 2025 article, are you aware of any published studies that indicate there's been a major change affecting the reliability or accuracy of Apple Health data since those earlier studies?

**A**      I am not aware of any articles or publications or content out there that shows that there has been a dramatic change making that have a larger error rate for steps or stating that this data is inaccurate.

**Q**      Okay.  Looking back, then, to Government Exhibit 5, the Whiffin 2025 study.

Was the author able to make any conclusion or determination as to the accuracy of the step counts in that operating system in the Apple Health data?

**A**      He, again, came to similar conclusions of my personal testing and of previous, which is that the steps are fairly accurate.  I think his steps counts were off by, like, two.

He does also talk about the reliability of ascension, so the flights climb, quote/unquote, artifact, and he finds that semi reliable.  He climbed what the device would consider four flights, and on some devices that he carried in a tray up the flights, it records him as three and the other ones as four.  It never over records.

**Hyde (Direct)**

But that is not necessarily equal to, and it definitely isn't in his paper, to physical flights.  Flights ascended are based on every three meters of elevation.  That elevation has to have movement with it.  So he did test -- no, it was the other article tests with the elevator, which we haven't gotten to yet, but it does need movement and a distance of elevation change of three meters to record a flight.  So if your steps are shorter or longer, it will affect the total number of flights recorded.

But it did still record those changes in elevation with movement, which I think is a more appropriate way to describe flights climbed, because I think that it's a little bit confusing because of the common term that is used that could have a wrong association.

**Q**     All right.  And I want to come back to the flights climbed here in a few moments.

**A**     Sorry.

**Q**     That's okay.

Finishing up with the Whiffin 2025 study --

**A**     Uh-huh.

**Q**     -- in fact, Ian Whiffin found that, in his words, the step count was, quote, remarkably close to the actual number of steps taken?

**A**     That's correct.

I believe that it was off by two steps over a large

**Hyde (Direct)**

amount of steps taken.

**Q**     All right.  So two steps.  Not even two percent, but two steps?

**A**     Two steps.  Correct.

Less than two percent.

**Q**     All right.

**A**     There were 300 steps taken, so -- close to 300 --

**Q**     Now --

**A**     -- 290 something.

**Q**     All right.  Now when we look at all of these studies together --

**A**     Uh-huh.

**Q**     -- and your own experience in testing and creating data using the health database, are you able to make a correlation between steps and distance?

Or can you explain, actually, how those two things interact to make your analysis more reliable.

**A**     Sure.

What's great is all of these -- the information is being corroborated by the fact that there are multiple artifacts in play.  So the fact that we see steps at the same time we see distance traveled is going to help eliminate things such as me taking a phone and just shaking it in the air, because there's some distance traveled associated with the steps, regardless of the accuracy point

**Hyde (Direct)**

of those steps.

Also, we can look at those steps and look at the distance and see if those are measurably appropriate to the location.  I mean, in a perfect scenario, you can then go out and bring that to the location and that -- especially if there's other corroborating artifacts or what -- and ascertain if that distance matches up to those steps appropriately with the other facts of matter in the case.

**Q**     All right.  I do want to return here just for a moment to flights climbed data.

You mentioned that the 2025 Whiffin article measured that as an elevation or an ascension of three meters; is that right?

**A**     That's correct.

**Q**     So however many actual physical flights of stairs that turns out to be, the Apple Health data app captures every ascension of three meters as a flight climbed?

**A**     Correct.  When there is movement.

So, I want to be clear, if you're in an elevator, it's not going to record that.  And if -- just for connection to imperial, this is about 9.8 feet, so just shy of 10 feet.

**Q**     All right.  And that's an important point, that it requires movement, because we look then at what I'll label as Government Exhibit 6.

Showing you on the screen a 2023 study by

van Zandwijk, Lensen, and Boztas that also looked at the flights climbed data in the Apple Health app; is that right?

**A**    That's correct.

      And this is a peer-reviewed article.

**Q**    All right.  And what were these authors specifically looking at with respect to the flights climbed data?

**A**    They were looking at the accuracy of the -- how the data is recorded.  And their conclusion is that this data is fairly accurate of showing ascension.

      This is where they -- this is the article where they tested against an elevator, where they tested different methods of ascension.  And the height difference did have a variance.

      This was -- however, they did note that while walking speed and how you carry it has an effect, they noted that that effect was minor.

**Q**    All right.  So when we talk about movement required, in an elevator -- so, for example, we're on the 19th floor of this courthouse.

**A**    Uh-huh.

**Q**    I rode the elevator up 19 floors, and I stood still in the elevator, would we expect the Apple Health data on an iPhone that I was holding, or that was in my pocket, to show that I ascended 19 floors or that I had 19 flights climbed?

**A**    No.

**Hyde (Direct)**

**Q**     Why not?

**A**     Because you weren't walking while -- at the same time that you were having an increase in elevation.

**Q**     All right.  So the Apple Health data and the Apple Health app can differentiate between ascending without movement and ascending with movement?

**A**     Correct.

**Q**     And that's what it requires before it registers a flight climbed?

**A**     Based on the trace evidence that is left, the notation is that we don't see that increase when steps aren't done.

I can't speak to Apple's coding.

**Q**     Okay.  And we'll come back to that here in a few moments.

Now all of these articles that we've talked about -- Government Exhibits 3, 4, 5, and 6 -- they use the method of testing similar to the one that you've described in your own research; is that right?

**A**     That's correct.

**Q**     And that method is to take a known recorded, outside-the-app recorded, measures of steps and distance, and then to compare that with what the app registered?

**A**     That's correct.

**Q**     And all of those studies used health data from the healthdb_secure.sqlite -- I may have put those in the wrong

**Hyde (Direct)**

order -- but the secure SQLite health database?

**A**      You had it right perfectly the first time.  The -- you've been saying it a lot.  The healthdb_secure.sqlite.

But these articles did also look at the cache-encrypted c.db.

And of note, they're -- when you're testing, you're usually imaging immediately, so that data was available --

**Q**      All right.

**A**      -- with -- it's temporal in nature.

**Q**      And that data was not available in this case because of the time at which the phone was recovered and imaged?

**A**      Correct.

The furthest back I have for step count and elevation is October.

**Q**      All right.  Based on your training and experience in this field of digital forensics, and your experience in scholarly publishing and peer review, is it unusual to you that there aren't additional published studies on this same topic?

**A**      No.

One of the requirements that's often used for publication is novelty.  So in order for something to make it through to publication, it has to be different than what's been published before, because the peer reviews corroborate, so the time of publication would be if

something changed or something's new.

Having been an associate editor for a peer-reviewed journal, that is definitely a quality on the checklist for determining if something even gets peer reviewed, and if something doesn't have a novel discovery, it typically would be what's called bench rejected.

Which, sir, Your Honor, not to speak to your bench, but the bench of the board that is determining what goes forward.

**Q**     And so, we don't have scholarly journals or even blogs on this topic, publishing repetitive studies over and over again showing the same thing, because there's not a novelty aspect?

**A**     Yes.

I would say that Mr. Whiffin's blog in 2025 does confirm some of the results in the 2019 study.  However, the reason for that confirmation was he then went on to test something novel, which was the movement in a vehicle, does it cause steps.

And things like going over a speed bump can cause steps to be registered, but the rest of the vehicle wouldn't enter -- if the phone was docked, it wouldn't.  But he was -- he -- those were the things that were the differentiators in what he was publishing.

**Q**     All right.  Now I do just want to talk briefly about

the authors that we've noted here.

Are you familiar with each of them, aside from the study that you've read particularly in this case?

**A**     I am familiar with Jan Peter and I am familiar with Ian Whiffin.  I do not know the other authors.  But I do know both Jan Peter and Ian Whiffin.

**Q**     All right.  And when you say Jan Peter, it stands --

**A**     I have a hard time with the last name.  I apologize. So I was referring to his first name.

**Q**     I'll try it.  van Zandwijk.

**A**     van Zandwijk.

**Q**     And I'll spell that.

V-A-N.  Space.  Z-A-N-D-W-I-J-K.

What can you tell us about Mr. van Zandwijk.

**A**     He is associated with the Netherlands Forensics Institute, otherwise known as NFI.  He regularly publishes in the *Digital Investigations* journal.  Multiple times I've seen him speak at DFRWS EU, which is a European digital forensics academic research conference.  That's how -- that's how I know him.

And he's been published many times.  I've referred to many of his papers.  And, like I said, I do know him from the academic research circuit in digital forensics.

**Q**     And is he a recognized authority in digital forensics analysis?

**Hyde (Direct)**

**A**    Yes.

**Q**    All right.

**A**    Highly recognized.  Highly respected.

**Q**    And Ian Whiffin, can you tell us about Ian Whiffin, please.

**A**    Yes.

Ian Whiffin is currently with Cellebrite, one of the tool manufacturers.  He is former law enforcement.

Not only is he a terrific examiner, he has done lots of things on his blog that have actually been submitted to DFIR Review.  And I have actually done some of the peer review for publications that he's submitted to DFIR Review from his blog.  He hadn't submitted this one in particular. But several of his others, I've done the peer review.

Him and I have testified in the same cases before multiple times.

And he makes some of the tooling that I used in this analysis, including ArtEx.

**Q**    And as with Mr. van Zandwijk, is Mr. Whiffin a recognized authority in the field of digital forensics?

**A**    He is.

Mr. Whiffin is very, very well respected in the field of digital forensics.

**Q**    You mentioned just a moment ago that you and Mr. Whiffin have testified in some of the same cases.

Have you testified as an expert in digital forensics previously?

**A**  Yes.

**Q**  How many times have you testified?

**A**  One, two -- four.

Thank you.  Sorry.

**Q**  That's okay.

**A**  Counting.

**Q**  And in each of those cases, were you recognized by the Court as a person able to provide an opinion as to your analysis in digital forensics?

**A**  Yes.

**Q**  Ms. Hyde, based on all of the studies that we've looked at here today, the ones that you looked at as part of your analysis in this case, as well as your own experience in working with Apple Health data, do you have an opinion on the reliability of Apple Health data for purposes of a forensic data analysis?

**A**  Yes.

**Q**  And can you tell us that opinion, please.

**A**  I believe that the step counts stored in healthdb_secure.sqlite is accurate enough to be utilized in digital forensics examinations and to be considered near accurate to step counts when corroborated with other evidence.

60

**Hyde (Direct)**

I feel that the -- the data pertaining distance traveled is a clear indication of movement of the device, and when utilized with the error rate, it can be used to show the distance that the device traveled when we take into account the derivation.

**Q**     Do you have an opinion as to the usefulness and reliability of the flights climbed data that we talked about?

**A**     Yes.

The flights climbed do show an ascent and correspondence with movement of a minimum of three meters for each flight climbed.

**Q**     All right.  I want to talk now, just briefly, about the argument, that I think you're familiar with, that because Apple Health data is propriety data, that it's less reliable or unable to be used in digital forensics analysis.

Are you familiar with that sort of line of thinking?

**A**     Yes.

**Q**     Is it accurate to say that the method of data collection by the Health app is propriety to Apple?

**A**     Yes.

**Q**     And to your knowledge, is that information known or shared outside of Apple?

**A**     I do not know of any instance of Apple publishing that information.

**Hyde (Direct)**

**Q** All right. And, in fact, in certain, perhaps, of the articles that we've talked about today and studies we've talked about today, but certainly others, there have been efforts made by researchers to figure out how Apple collects that data; is that right?

**A** There have been efforts to figure out how the data is stored and what causes it to be stored.

**Q** Okay. Is that information, that propriety information, widely known within Apple to its engineers?

**A** I wouldn't have intimate knowledge of that. But I would suppose not since it's such a vast ecosystem. But I have no knowledge of what independent engineers in Apple would know.

**Q** Okay.

**A** I would say, in other instances, Apple has been asked things and not necessarily able to provide answers.

But I can't speak to this specifically.

**Q** Can you talk about the difference between raw code, which are the -- well, you tell us.

What is raw code in this scenario, the Apple Health data?

**A** So raw code would refer to Apple's actual programming base of how they wrote the program to function. Right? So the raw code would be the actual operating system and how it functions and how it tells the device it should function.

**Q**     And is your knowledge of raw code or the availability of raw code necessary for an accurate and complete forensic analysis of a particular device?

**A**     Not at all.

**Q**     And is it even helpful in a forensic analysis to have that raw code?

**A**     Potentially.  But I would never rely upon it.

Code is written to do the function it's written to do. It's not written to analyze the traces that are left behind.

We can better determine, from a forensics perspective, what traces are left behind because we can test a variety of circumstances.

AUSA PETER DALY:  Just one moment.

THE WITNESS:  Yes.  Certainly.

THE COURT:  Okay.  That's gone off a couple times there.

THE DEFENDANT:  I apologize, Your Honor.

THE COURT:  So it should be off, all phones in the courtroom, and there should be no use of cameras and so forth, if I need to say that.

But it has to be absolutely off.

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  You may proceed.

**BY AUSA PETER DALY:**

**Q**     All right.  I'm sorry.

You can continue.

If you'd like to start your answer over, that might be helpful.

**A**    I will.

So the raw code would not be as helpful in an analysis because when you're going through raw code, you're going through it in the function in which it was designed.

Now we will say that not all documentation of code is good, and you would need to know what external calls go to, so it's a very deep analysis, reverse engineering of that code.

However, it is going to do the thing it was designed to do.  Right?  It's going to function through the thing it was designed to do.  The code doesn't think about what other circumstances could cause things to register.

So, for example, the digital forensics testing done with shaking the phone or going over the speed bump actually allows us to know more about what traces are left than reading the code.  The code is not designed to think about what traces it leaves.

The digital forensics artifacts that we examine as digital forensics examiners were not developed for us to be able to analyze these things.  The most appropriate way to determine what a piece of trace evidence is is through robust testing and analysis.

**Hyde (Direct)**

**Q**     And so, does your lack of knowledge of Apple's propriety information for the collection and storage of this data make your forensic analysis of Apple Health data less reliable?

**A**     No.

**Q**     And, in fact, the tools that you used for your forensic analysis are designed to look at artifacts and what data is created as opposed to how it's created; is that right?

**A**     That's correct.

**Q**     And I think what you've testified to here today is that that is the information that is useful or most useful in a forensic analysis, not necessarily how the program, the Apple Health app, actually collected and stored the data.

The fact that the data exists and what the data is, the artifacts are more important than the collection of it; is that right?

**A**     The artifacts are more relevant to my area of study and expertise.

**Q**     All right.

            AUSA PETER DALY:  If I can have one moment, Your Honor?

            THE COURT:  You may.

                  (Pause in Proceedings)

            AUSA PETER DALY:  Nothing further, Your Honor.

**Hyde (Cross)**

THE COURT:  All right.  We can take a couple breaths.

And we're going to go until about 11:00, and then we'll take a break, but we can take about two minutes now as we -- as we're adjusting to cross-examination.

ATTORNEY TIMOTHY IVEY:  Thank you, Your Honor.

Your Honor, if I could just take a brief break and run out real quick?

THE COURT:  Yeah, if anyone else needs to take a bathroom break, take that.  We're going to continue until 11:00 and we'll take our real break at that time.

(Pause in Proceedings)

THE COURT:  So we'll start now and go about 15 minutes.  I have a matter, which won't be overly extended, at 11:00, but I think it will be maybe 15, 20 minutes, and then we'll come back and we'll go until we finish up.

AUSA PETER DALY:  Thank you, Your Honor.

THE COURT:  Mr. Ivey.

ATTORNEY TIMOTHY IVEY:  Thank you, Your Honor.

**CROSS-EXAMINATION OF JESSICA HYDE**

**BY ATTORNEY TIMOTHY IVEY:**

**Q**    Okay.  Good morning, Ms. Hyde.

**A**    Good morning, sir.

**Q**    Okay.  You were provided data to review in this case;

correct?

**A**     That's correct.

**Q**     And in your extensive experience with your company, you said you've done training in forensics with various law enforcement agencies?

**A**     That's correct.

**Q**     And law enforcement officers?

**A**     That's correct.

**Q**     And also in the intelligence community on behalf of the government; is that correct?

**A**     That is correct.

**Q**     But you have not served as an expert for a defense counsel in a criminal defense case, have you?

**A**     That is correct.  I have not.

**Q**     Now, consistent with your background, it was law enforcement or the government that asked you to review the data in this case; correct?

**A**     That is correct.

**Q**     And you were asked to review and provided a full file system forensic image; correct?

**A**     Can you repeat the question.

**Q**     A full -- am I saying that right, a full file system forensic image?

**A**     That part was correct.

What was the question part before that?

**Hyde (Cross)**

I apologize.

**Q**     You were provided that?

**A**     I was provided that.  Yes.

Thank you.

**Q**     Okay.

**A**     I didn't hear the provided.  I apologize.

**Q**     And you were asked to review the data that -- of that from a time period of 8:15 to 9:00 a.m. on August the 15th, 2024; is that correct?

**A**     That is correct.

**Q**     And your analysis was limited to that time window?

**A**     That's correct.

**Q**     You did not attempt to reconstruct the broader context in time periods before or after that time period?

**A**     That is correct, for time related artifacts.

**Q**     Okay.  Now in your report, you were provided other data or information other than that full file system forensic image; correct?

**A**     That's correct.

**Q**     You note in your report that you were provided router information, screenshots, surveillance video, and things of the like; is that correct?

**A**     That is correct.

**Q**     But you did not review any of those items as part of your analysis?

**Hyde (Cross)**

**A**     I -- I reviewed the Wi-Fi list, and checked that against the Wi-Fi known locations, but I did not have those, those were not in the dataset.

But that is the only thing from those other items that I looked at.  The rest were just stored on their drive.

**Q**     Okay.  And in your report, you list as items not reviewed as part of this analysis --

**A**     Uh-huh.

**Q**     -- and down there is the router information; correct?

**A**     Correct.

I believe I might have been given those Wi-Fi addresses verbally by Mr. McCausland, but I received -- I received -- I did check to see if there were known Wi-Fi locations, so he told me he gave that, but I don't -- I did not, like, look at that set, but I did review Wi-Fi locations.

**Q**     Did you note in your report that you looked at Wi-Fi locations?

**A**     I did not.  I did not note that I looked at it, but you asked what else I looked at so --

**Q**     So that's not noted in your report, is it?

**A**     Correct.  Because there were no findings.

**Q**     So your conclusions in this report were reached without reviewing all the materials that were provided to you?

**Hyde (Cross)**

**A**     Correct.

**Q**     Now the subject iPhone that's at issue here today was not examined by you itself; correct?

**A**     I do not understand the question.

**Q**     You were not provided the phone itself --

**A**     I was not provided the phone itself.

**Q**     -- the physical phone?

**A**     Correct.

**Q**     Right.

     And so, you reviewed, as I think you've already indicated, the full file system extraction?

**A**     Correct.

**Q**     All right.  But you did not extract -- my point is, you did not extract the data from the phone yourself?

**A**     Correct.  I was provided the extraction.

**Q**     That was done by law enforcement, the actual extraction of that?

**A**     That is correct.

**Q**     All right.  Now it -- it's your understanding, is it not, that the extraction was done by law enforcement in October of 2024?

**A**     That -- to the best of my knowledge, yes.

**Q**     And since October 2024, there have been many updates to the forensic extraction software?

**A**     That's correct.

**Hyde (Cross)**

**Q**     And if -- but these were not employed because you were not the one that extracted it; right?

**A**     I'm -- not employed for the purpose of extraction.  I did --

**Q**     Correct.

**A**     -- run newer versions of forensic tooling.

**Q**     But law enforcement is the one that extracted it from the phone?

**A**     Correct.

       But once the data is extracted, that's -- that's extracted.

**Q**     Now you examined the Apple Health data in this case --

**A**     That's correct.

**Q**     -- related to this phone?

**A**     That's correct.

**Q**     Now Apple Health data, it does not directly tell you -- well, it's different than the GPS; correct?

**A**     That's correct.

**Q**     In other words, it does not directly tell you where a person was, only that the device is recording certain motion related metrics?

**A**     That is correct.

**Q**     Like walking/running distance, speed, things of that nature, flights ascended?

**A**     That is the items recorded.  That's correct.

**Hyde (Cross)**

**Q**     Right.

But it doesn't tell you exactly where a person is?

**A**     That's correct.

**Q**     All right.  Like a GPS would do?

**A**     That's correct.

**Q**     And this Health data is collected in its own little separate database in the phone?

**A**     That's correct.

**Q**     And your report notes that there are two SQLite databases with the same name; is that correct?

**A**     Similar names.

One is healthdb_secure.sqlite and one is healthdb.sqlite.

**Q**     But they're both secure databases; is that correct?

**A**     What do you mean by secure, sir?

**Q**     I thought that's what you captured in your report.

**A**     What -- the title of one of the databases is healthdb_secure.sqlite.  That is the name of the database.

**Q**     Right.

So there were two secure databases; correct?

**A**     There are two databases.  There's -- one of them has the word secure in its title.

**Q**     All right.  And you state that they have the same hash value?

**A**     I didn't state anything about the hash value of the

database.

I spoke to the hash value of the full file system image and the Keychain file.

**Q**     You indicate in your report that, of note, there were two SQLite databases with the --

**A**     Oh, I apologize.

**Q**     -- same name located at the location.

**A**     I apologize.

Yes.  That is correct.  That is correct.

**Q**     And then you said:  Verified that both instances of the healthdb_secure.sqlite had the same hash value.

**A**     Yes.  Thank you for refreshing my memory.

Yes.  This is an artifact of the extraction.

**Q**     Okay.  And a hash value is, like, kind of like a digital, as I think you testified to, footprint for the app; is that correct?

**A**     It's a -- more of a signature that says that this is what the value -- that this is the value that represents the data as it is.

Any changes to it would change that algorithmic value, so the fact that both of those are the same showed that those two databases are identical copies of each other.

**Q**     So the hash values are -- just for the benefit of the Court, and also for me, hash values are important, they ensure that the app is not tampered with for security

**Hyde (Cross)**

purposes; correct?

**A**     The hash value is used for demonstrating the integrity that something hasn't changed for us, not for Apple and using it for security in the way it functions.

**Q**     Right.

**A**     We use that as digital forensics examiners.

**Q**     And it detects corruption, like you said, integrity, it detects corruption or modification?

**A**     Correct.

**Q**     And it verifies the app is authentic?

**A**     Not that the app is authentic, but that the data hasn't changed.

**Q**     Your report does not indicate why there are two data -- same databases; correct?

**A**     That is correct.

**Q**     Did you investigate this?

**A**     I did research the reasons that that can occur, and it is most commonly an artifact of the extraction.

**Q**     Okay.

**A**     So that happens when the forensics tool is completing the extraction.

**Q**     Your report does not indicate that you investigated this, other than noting it; correct?

**A**     It indicates that I shared that the -- that the databases had the same hash value, which indicates that

there is no difference between them, not warranting further deeper investigation.

**Q**     Isn't this unusual that there were two?

**A**     It's -- it's not typical, but it does occur.

And that is the reason that we know that sometimes that happens from the extraction tool.

**Q**     But you felt it was noteworthy enough to put it in your report?

**A**     Correct.

Noteworthy to note that there is no difference between those two databases.

**Q**     Okay.  And so, you didn't indicate in your report your explanation that you just gave us?

**A**     That is correct.

**Q**     Okay.  All right.  Now this Apple Health data is propriety; correct?

**A**     That is correct.

**Q**     Apple collects this data in its app through the use of an algorithm?

**A**     Correct.

**Q**     And an algorithm is like a set of instructions on how the data is collected in the app, how it's analyzed, and how it reaches its conclusion; correct?

**A**     I don't believe that an algorithm reaches a conclusion.  But the rest of the statement, I would agree

with.

**Q**     Okay.  So it's an instruction on how it collects it?

**A**     Instruction on how it collects data.  Correct.

**Q**     All right.  And by being -- it's kind of like the foundation of all software in apps; right?  I mean, they use algorithms?

**A**     Yes.  Algorithms are used throughout typical computer science applications.

**Q**     And so, because the algorithm or the app is propriety, that means, as I think you've testified to before, it's not available, the process, for you to get or the public to get; correct?

**A**     That is correct.

**Q**     Only Apple has that information?

**A**     To the best of my knowledge, only Apple does.  I don't know if Apple shared it with other parties.

**Q**     Right.

But it's not shared --

**A**     Publicly, no.

**Q**     -- by any of the -- it's not known by any of the studies that you cited in your --

**A**     Correct.

**Q**     -- report; right?

And so, that makes it kind of difficult, isn't it right, to have it -- the propriety of it to be tested?

**Hyde (Cross)**

**A**     It does not make it difficult to test.

**Q**     Well --

**A**     It exists.  Testing doesn't change.

**Q**     -- how it's processed, how it works, as to whether or not they can make false positive, false readings or errors or any challenges to how it's collected, we can't know that because it's propriety?

**A**     We can know that through testing.

**Q**     Okay.  So --

**A**     We would not have that knowledge through reading the code.

**Q**     So you have had Apple -- in previous cases that you have testified in, you have had your testimony not be allowed to go to the jury because one of the factors is that the Apple data that is founded on this is propriety; correct?

**A**     That has nothing to do with Apple Health data.

        I assume you are referring to *Herrera* in Maryland?

**Q**     I am.

        And it did not deal with Apple Health data accuracy?

**A**     No.  It is in reference to significant locations.

**Q**     Locations.

        But my point is, because one of the factors that the Court used to exclude it was the fact that it -- that the Apple Health data was propriety in nature; correct?

**Hyde (Cross)**

**A**     The Court chose to exclude it mainly in reference to a case in -- in Massachusetts, which is *State versus Arrington*, and that case is currently in a retrial with a current *Daubert* that there's been no ruling on on that data.

**Q**     Okay.  Now in your CV, you noticed -- you list numerous trainings -- impressive -- and certifications and licensings that you have, and I think you've testified to them previously?

**A**     Yes, sir.

**Q**     Okay.  Are any of those trainings or certifications or licenses related to the iPhone Apple Health data?

**A**     Some of those trainings covered Apple Health data.

So, for example, I took the SANS FOR518 iPhone and Mac analysis course.  And that course deeply delved into Apple Health data.  And the instructor of that course, Sarah Edwards, has written about Apple Health data in the past.

**Q**     Okay.  Does your CV notice any specific certifications or licenses relative to the iPhone Apple Health data?

**A**     No.  No such thing exists.

**Q**     In your CV, you noticed -- you list numerous publications, presentations, and trainings rel -- are any of those specific to iPhone Apple Health data?

**A**     None of my presentations are specific to Apple Health data.  That would be in the courses I teach.

**Q**     Have you ever written any scholarly or peer-reviewed

article on iPhone Apple Health data?

**A**    I have not written a scholarly article on Apple Health data.

**Q**    Okay.  Now you -- so I want to jump up to when you began your testing on this.

You note in your report that you used various forensic tools when you analyzed the information that you were given; correct?

**A**    That is correct.

**Q**    Magnet AXIOM?

**A**    Correct.

**Q**    Cellebrite?

**A**    Correct.

**Q**    iLEAP?

**A**    Correct.

**Q**    ArtEx?

**A**    Correct.

**Q**    And HEART?

**A**    That is correct.

**Q**    And not every one of these tools parses the data the same way?

**A**    That is correct.

**Q**    And your report does not clarify the differences produced by these tools?

**A**    I've -- my report refers to my analysis and

correlation of the data from those tools, as well as my

manual analysis of the SQLite database in question.

**Q**     So your report, you put a chart of your findings -- I

want for a better word -- starting on page 3 and ending on

page 4; correct?

**A**     Can I review it to see if those are the page numbers?

**Q**     You sure can.

                         (Pause in Proceedings)

**A**     That's correct.  Pages 3 and 4.

**Q**     Okay.  And your chart on your report doesn't clarify

the differences produced by any of these tools or if there

are any?

**A**     This is based on my analysis of the data from the

tools correlating and corroborating those artifacts.

**Q**     And your chart doesn't indicate which tool you relied

upon in putting the information in each of the various

categories, does it?

**A**     It does not.  Because my analysis doesn't rely on one

sole tool.

**Q**     Now your report doesn't provide any side-by-side

comparison of what you -- what is -- the information you

gleaned from each tool; correct?

**A**     That is correct.

**Q**     Now your report does not indicate whether you did any

manual validation of this data, like comparing the data in

the chart to the Apple Health database?

**A**     I don't recall if I mentioned that in my report, but I absolutely did that.

**Q**     Okay.  But it's not in your report?

**A**     I would have to read and look.  I apologize.

**Q**     Okay.  Now in support of your work in this case, you list -- you cite various articles, and we've been through them; correct?

**A**     That is correct.

**Q**     Now you had indicated that you had done some of your own testing on the Apple Health data?

**A**     My testing was not directly in support of this case. But I have previously tested Apple Health data.

**Q**     Okay.  Previous to --

THE COURT:  Mr. Ivey, let's take up right there when we come back.

THE WITNESS:  Okay.

THE COURT:  I have to take a break now.

ATTORNEY TIMOTHY IVEY:  Okay.

THE COURT:  So it will be about 20 minutes, and then we're going to go until we complete.

ATTORNEY TIMOTHY IVEY:  Yeah, I only have maybe five minutes of questions left.  But, sure, we can wait.  Whatever you --

THE COURT:  20 minutes I think.  However, I

might be less than 20.

ATTORNEY TIMOTHY IVEY:  Okay.

- - -

(Recess taken at 11:01 a.m.)

(Court resumed at 11:23 a.m.)

- - -

ATTORNEY TIMOTHY IVEY:  If I can just have one moment?

THE COURT:  All right.  Sorry to interrupt your examination, Mr. Ivey, but I had another matter I had to take care of, but I've completed that now.

(Pause in Proceedings)

ATTORNEY TIMOTHY IVEY:  Okay.

THE COURT:  Ready?

ATTORNEY TIMOTHY IVEY:  Yes.

Thank you.

**CONTINUED CROSS-EXAMINATION OF JESSICA HYDE**

**BY ATTORNEY TIMOTHY IVEY:**

**Q**    So I think when we broke I was asking you about what you cite in support of the conclusions and this testing that you did in this case.

And in the reference, you cite certain references at the end of your report; correct?

**A**    Yes.

**Q**    And those references don't include any of your

personal studies that you talked about or testings that you've done?

**A**    That's correct.

Those were not peer reviewed or published.

**Q**    All right.  Now, we talk about steps.

How does -- you indicated you've had training or some respect with the Apple Health data; right?

**A**    Yes.

**Q**    How does Apple define what constitutes an actual step?

**A**    I don't know how Apple defines it.

**Q**    All right.  Well, let's talk about some of the articles that you reference in support of your work in this particular case.

Whiffin, Whiffin is an article, obviously, that you put some stock into and some credibility in because you cite it?

**A**    Yes.

**Q**    And -- but this article that you cite in your report, it was not peer reviewed?

**A**    Correct.  And I stated that.  Yep.

**Q**    And you indicated that it references -- and I want you to be clear with me on this.

This iPhone that was utilized in this case was the iPhone 14; correct?

**A**    I'm sorry.  Referring to the testing?  Or to

**Hyde (Cross)**

Mr. Dawson's device?

**Q**     Mr. Dawson.

**A**     Yes.  That was an iPhone 14, yes.

**Q**     And you indicated that this iPhone version 18.1 indicates that there hasn't been much change in -- in what?  In how -- the accuracy of the data?  Or what?

**A**     In Mr. Whiffin's device, the 18.1?

I just want to be clear, because we're talking about multiple devices.

**Q**     Yes.  What you were testifying to.

**A**     So what I was stating is that Mr. Whiffin tested an 18.1 device, which demonstrates that there has not been significant changes between the older testing, the step accuracy is maintained.

**Q**     Okay.  So it's your testimony that this study used this 18.1; is that correct?

**A**     The study that -- of Mr. Whiffin's uses -- one of the many devices is a device with iOS version 18.1.  That is correct.

**Q**     Okay.  So I have Mr. Whiffin's report here.

ATTORNEY TIMOTHY IVEY:  Is the ELMO on, Your Honor?

COURTROOM DEPUTY:  Yes, it is.

**BY ATTORNEY TIMOTHY IVEY:**

**Q**     On page 3 of the report, it appears -- this is what

84

**Hyde (Cross)**

you're talking about here, this iPhone version 18.1?

**A**      That is correct.

**Q**      Okay.  But on page 5, it indicates that, actually, the testing only used, the three iPhone X devices were used for the testing.

**A**      You are in a different part of the testing.

If I could see a copy of the article, I could make a clearer explanation.

Would I be able to see a copy?

**Q**      Sure.

**A**      Thank you.

THE COURT:  What's the exhibit number on that? I forgot.

THE WITNESS:  Can you please tell me which page.

AUSA PETER DALY:  That's Exhibit 3, Your Honor.

THE WITNESS:  Can you please tell me which page you were referring to.

**BY ATTORNEY TIMOTHY IVEY:**

**Q**      Page 3 first.

**A**      The second page you were referring to.

AUSA PETER DALY:  I'm sorry, Your Honor.

It's Exhibit 5.  I apologize.

**BY ATTORNEY TIMOTHY IVEY:**

**Q** Page 5 of the report. 4 and 5.

**A** That is the specific to the testing of the distance for that rugby field test. The step count was tested with the 18.1. Those are two different tests.

**Q** The distance, though, did not utilize that particular iPhone; correct?

**A** The distance --

**Q** I think you just said that.

**A** -- measurement, you are correct, that was using the iPhone X with 16.7, 16.75, and I believe there was one more, and 15.2.1.

That is correct, for the distance portion of the testing.

**Q** Exactly.

Okay. And then, on page 4, since I have -- you have it up there; right?

**A** Uh-huh.

**Q** Under conclusion, it says: The conclusion drawn from these tests is that the timestamps shown are not necessarily exactly when the activity took place.

**A** Correct.

The timestamps, which we were -- we were not speaking to earlier, the timestamps do have a variation. The -- sometimes the timestamp is -- the recorded end time is after

the end time has completed.

In that, what you were referencing there, that 15 seconds to 50 seconds, is referring to the flights climbed.  The -- the ascent time is 10 to 15.  I believe all of the deviation in seconds was referring to the distance traveled, and it's when the end and the start starts, if that makes sense, when it actually records.

And what you're saying, when you say that this time occurred between these steps, or this distance between this time, and that would still be accurate.

**Q**   And then, if you -- in wrapping up the Whiffin report --

**A**   Uh-huh.

**Q**   -- there's certain aspects I'd like you to speak to.

So that would be page 12 of the report at the end, very end.

**A**   I'm there.

**Q**   The first point, the cache-encrypted c.d database may be able to give more granularity than the Health database, secure.db.

You didn't have that available in this case, did you?

**A**   I had the cache-encrypted c.db available.  However, there is not data that goes back to August.

**Q**   Okay.  So for the relevant time period, you did not have it?

**Hyde (Cross)**

**A**     That is correct.

**Q**     And that would have provided more granularity, potentially?

**A**     Granularity and accuracy are two different things. But potentially.

**Q**     The number of steps recorded is a reasonably reliable indicator of steps taken when walking; correct?

**A**     That is what Mr. Whiffin states there.

**Q**     Okay.  But in his studies, we know, based upon this test study, that the person was walking?

**A**     That's correct.

**Q**     Unlike a situation where it's contested whether or not the person is even really walking?  In other words, in the tests in your studies that you cite, it's a given the person is walking; right?

**A**     One moment.

       I believe that there were some studies -- yeah, there are studies in Mr. Whiffin's report referring to doing tests in vehicular situations to see if steps or distance are recorded.

       There was, in one of the other studies, Mr. -- it begins with a G -- that steps were not recorded when bicycling.

       So several of these studies examined other situations.

**Q**     Correct.

But my point simply is, and in those situations, false -- like, shaking the phone or going over speed bumps in the car can cause a registering of steps when there's no walking?

**A**    That -- there are indications of that.  That is correct.

**Q**    All right.  Now I'd like to talk to you about the Cellebrite report.

In the Cellebrite report, that one, also that you've cited, has not been peer reviewed; correct?

**A**    Correct.  As I've stated before, that is not a peer-reviewed blog post.

THE COURT:  Refer to the exhibit number again, Mr. Ivey.

ATTORNEY TIMOTHY IVEY:  Okay.  What is the Cellebrite exhibit, the first one that you went over that dealt with Cellebrite.

AUSA PETER DALY:  3.

ATTORNEY TIMOTHY IVEY:  Government's Exhibit 3.

**BY ATTORNEY TIMOTHY IVEY:**

**Q**    I'll go back.

That was not peer reviewed; correct?

**A**    Yes.  That's correct.

**Q**    And in that study, though, the person was known to be

walking?

**A**     There was walking and bicycling in that study.  And the bicycling did not record any steps.

**Q**     Right.

But the subject that was walking we know was walking?  In other words, they had the person walk with the phone --

**A**     Correct.

**Q**     -- to do the study?

**A**     One of the studies in that report.  Correct.

**Q**     All right.  Now you talked about the article *Have you been upstairs?;* correct?

**A**     That is correct.

**Q**     And back on this concept of these -- the tests done in these articles were controlled circumstances; correct?

**A**     They are controlled.  That is correct.

**Q**     Okay.  And, in other words, you have someone walk or bike and it's a given, you know, as part of the test the person is on the bike or walking; correct?

**A**     Correct.

**Q**     Now -- and in those circumstances, according to your articles, in your opinion, then that's relatively reliable, in your experience, in the data that's recovered from that; correct?

**A**     I don't understand the question.

I'm sorry.  Can you clarify what you're asking.

**Hyde (Cross)**

**Q**     Your point is that this work that you did is reliable; correct?

**A**     That -- the work that was conducted by the National Forensics Institute in support of that peer-review published article, yes, the testing was done in accordance with NIST standards, with -- and it lines up very clearly with the processes identified by SWGDE, and was peer reviewed by experts in the field, so I would say it's highly reliable.

**Q**     Okay.  And in those tests, what I'm getting at, what I mean by controlled, they have someone walk, they know the person is walking when they do the tests?

**A**     That is correct.  That --

**Q**     And in those --

**A**     In order to do a test, yes.

**Q**     And in those tests, they know a person is bicycling, if they're bicycling; correct?

**A**     Correct.

**Q**     And in those tests, they know a person's in a car, if they're in a car?

**A**     Correct.

**Q**     All right.  But that can be -- there can be less reliability when you're talking about a real-world circumstance, where you're testing a circumstance where you didn't control what the person is doing or it's unknown?

**A**     I'm sorry.  I can't -- I don't understand what the

**Hyde (Cross)**

question is that you're asking me to respond to.

**Q**     Okay.  There weren't tests of free-living experiences where, like in this particular case, where you're given some data --

**A**     Uh-huh.

**Q**     -- but it's not a given what the person is doing at that particular time.

That's what I'm talking about.

Do you understand what I'm saying?

**A**     I -- I understand what you're saying, but I am not sure what I'm being asked to respond to, what the question is.

**Q**     Okay.  In those circumstances, when it's not known what the -- it's not a given, it's not a part of a controlled test --

**A**     Uh-huh.

**Q**     -- okay, then there -- the results or the testing are not as reliable.

Do you agree or disagree?

**A**     Are you talking about a test scenario or a non-test scenario?

**Q**     A non-test scenario.

When you're asking to look at data and apply it to a free-living circumstance.

**A**     In that instance, we apply our knowledge from testing

and verification and validation and knowledge of the artifacts.  That's a scientific principle that's applied to forensic evidence in the digital world.

**Q**    Your article, *Have you been upstairs?*, cites another article, *Digital traces and physical activities: opportunities, challenges and pitfalls*.

Have you read that?

**A**    I have.

**Q**    Okay.  And do you agree with the statement that not much research has been devoted to differences in traces between controlled and free-living experiments?

**A**    I -- I would need -- do you have the article so I can review the context, please.

**Q**    This -- this will have to be marked a defense exhibit.

This is defense exhibit --

THE COURT:  What's -- it's a defense exhibit. What's the --

ATTORNEY TIMOTHY IVEY:  A.

THE COURT:  Defense A.

(Pause in Proceedings)

THE COURT:  Did you have a copy for me?

ATTORNEY TIMOTHY IVEY:  Can I approach, Your Honor?

THE COURT:  You may.

THE WITNESS:  Thank you, Counsel.

**Hyde (Cross)**

What page were you referring to?

**BY ATTORNEY TIMOTHY IVEY:**

**Q**     I think in the copy there's a page 372.

**A**     372.

One moment, please.

Can you tell me which part of that section.

**Q**     Can you look at the top of the page, on the right-hand side of that first paragraph.

**A**     Ah, I see.

**Q**     Okay.  So do you acknowledge or agree with this statement where it states:  Not much research has been devoted to differences in traces between controlled and free-living experiments?

**A**     One moment.

I'm still getting context.  I apologize.

I would concur that the author here is stating that controlled experiments have the advantage of being able to determine accuracy and reliability, while free-living experience -- experiments can give information in more complex situations that help -- can help us understand real scenarios, as stated in the previous sentence.  I think that's the crux of it in the previous paragraph.

**Q**     Now you also refer to the van Zandwijk reports?

**A**     Yes.

But I will -- just for clarification, this article is

also by van Zandwijk, so I just want to make sure that we're clear.  Because now we've got three peer-reviewed van Zandwijk articles.

**Q**     Okay.  So I'm going to direct your attention to the article *The iPhone Health app from a forensic perspective: can steps and distances registered during walking and running be used as digital evidence.*

Do you have that article up there?

**A**     I do not have that article in front of me.

**Q**     Okay.  That's the Government Exhibit --

ATTORNEY TIMOTHY IVEY:  Which one was that?

AUSA PETER DALY:  4.

THE WITNESS:  Thank you.

And what page are you on, sir?

**BY ATTORNEY TIMOTHY IVEY:**

**Q**     On the copy, it's page S-132.

**A**     S-132.  I'm there.

Thank you.

**Q**     And it indicates, and I think you spoke to this before, under discussion and conclusions, do you see that?

**A**     Yes, sir.

**Q**     Where it states:  It is important to note that the converse need not always be necessarily true.  If steps or distances are registered by the Health app, this need not necessarily indicate that walking or running has taken place

Case: 5:25-cr-00173-SO  Doc #: 38  Filed: 04/07/26  95 of 118.  PageID #: 302

**Hyde (Cross)**

while carrying the telephone since, under specific conditions, there might be false positive registrations in the Health app.

**A**    I'm sorry.  Can you point to -- I'm not finding that on this page.

Can you tell me the first word of the paragraph or can you show me the --

**Q**    Do you see where it says discussion and conclusions?

**A**    I see discussion and conclusions.  Yep.

And then, which paragraph are you in?

I apologize.

**Q**    Right underneath.

**A**    Ah.  Thank you.

                    (Pause in Proceedings)

**A**    Oh, yes.  Now I see it.

Thank you so much for showing me.

These are very dense pages, sir.

                    THE WITNESS:  Your Honor, I just want to be clear.  It's hard to find the place.

**BY ATTORNEY TIMOTHY IVEY:**

**Q**    So this is an article that you --

**A**    That's correct.

**Q**    -- referenced in your work; correct?

**A**    That's correct.

**Q**    Okay.  So I'm going to read it again for you and you

tell me if it's right and you tell me if you agree with this.

It is important to note that the converse need not always be necessarily true.  If steps or distances are registered by the Health app, this need not necessarily indicate that walking or running has taken place while carrying the telephone since, under specific conditions, there might be false positive registrations in the Health app.

**A**     It is the -- it starts with the important to note that the converse may not be automatically always true, so I think the context of the initial, from the results presented in the section experimental results, we conclude that it is possible to use this data from the Health app for forensic purposes in cases where it is known or assumed that walking or running has taken place.

And I think it -- and with that given context, yes.

**Q**     Now you indicate, in the time frame that you were asked to evaluate from the data, that 8:15 to 9:00 a.m. time frame --

**A**     Yes, sir.

**Q**     -- you indicate in your report that significant activity occurred --

**A**     Yes, sir.

**Q**     -- correct?

What did you consider significant?

**A**   Demonstration of movement through steps and distance traveled.

**Q**   But you did not compare that to -- to give a context to other points of the day or similar days from prior weeks; correct?

**A**   That is correct.

That was outside of the scope of my investigation.

**Q**   Okay.

ATTORNEY TIMOTHY IVEY:  All right.  Thank you.  I have no further questions.

THE WITNESS:  Thank you.

THE COURT:  All right.  Mr. Daly, any redirect?

AUSA PETER DALY:  Yes, Your Honor.

Thank you.

**REDIRECT EXAMINATION OF JESSICA HYDE**

**BY AUSA PETER DALY:**

**Q**   Ms. Hyde, I want to start I think where Mr. Ivey left off with this idea of false positives.

So you mentioned that in I believe the van Zandwijk study from 2019 -- I may be wrong about which study it is, but one of the studies -- looked at the effect of traveling in a car and going over speed bumps or a person shaking a phone --

**Hyde (Redirect)**

**A**     Uh-huh.

**Q**     -- things of that nature could register false positives; is that right?

**A**     That is correct.

**Q**     Now I'll show you on the screen what I've marked as Government Exhibit 1.

First, I'll have you identify it.

Do you recognize the document in Government Exhibit 1?

**A**     Yes.  That's my report.

**Q**     And your report of your analysis in this case; is that right?

**A**     That is correct.

**Q**     And so, when we look at what Mr. Ivey has already talked about, this chart, beginning on page 3, of your relevant findings, we see from the period of 8:18 to 8:28 you registered activity?

**A**     Well, I did not register activity, sir.

**Q**     Sorry.

You observed activity in the data?

**A**     I observe activity in the data.  That is correct.

**Q**     All right.  And what activity did you observe?

**A**     Steps and a walking/running distance measured for the same period.

**Q**     All right.  Let's start with steps.

**A**     Uh-huh.

**Hyde (Redirect)**

**Q**     How many steps did you observe in the data for that time period?

**A**     According to the data recordings, it's 208 steps in that period.

**Q**     All right.  And based on your review of the articles we've talked about here today, as well as your own testing and use of the Apple Health data in your work, would you expect false positives to account for 208 steps?

**A**     With a large number like 208, I would not expect that to be a false positive, such as shaking the phone or bumping, and especially in -- in corroboration with a recorded walking/running distance.  So we have both steps and distance being demonstrated.

**Q**     And can you -- you've already talked a little bit about this, but in this specific instance, can you explain the correlation or the interplay between the steps and the walking/running distance.

**A**     So these are actually different recordings from different sensors.  The walking/running distance is measuring how far the device has moved.  The steps are measuring based on the -- information about the person's height, as well as information about their -- from their movement.

So steps can change, but we know that steps are about 98 percent accurate when we look at van Zandwijk's paper, so

the steps corroborate the fact that there was movement when associated with the walking/running distance.  So the fact that both exist demonstrates that it's not a blip, such as going over a speed bump, which might record a couple of steps.

**Q**    Right.

And so, are you aware of any portion of these studies or any other studies where an activity like, you know, a single shake of a phone or going over one speed bump would register a large number of false positive steps?

**A**    I am not aware of such a situation.

**Q**    Okay.  So what we're really talking about is if a car goes over a speed bump, the phone may register that as a step or a couple of steps, but we're not talking about it registering 50 steps or anything of that sort?

**A**    That's correct.

**Q**    All right.  Looking at page 4 of Exhibit 1, your report.

Again, we see between 8:28:03 and 8:37:48 you observe data?

**A**    Yes.

**Q**    And again, what data did you observe?

**A**    Recording of 136 steps.  And a walking/running distance of approximately 281 feet and 10 inches present in the data.

**Hyde (Redirect)**

**Q**     And so, here, again, would you expect, based on your knowledge and your experience with Apple Health data, would you expect 136 steps to be accounted for by false positives?

**A**     No.

**Q**     Especially in conjunction with the walking/running distance that you've noted at that same time frame?

**A**     That is -- that is correct.

Shaking wouldn't -- in other words, shaking a phone wouldn't produce the distance.  Going over a speed bump or the like wouldn't produce that sheer number of steps.  And those artifacts, in corroboration, make that seem to be fairly accurate for the steps taken.

**Q**     Now Mr. Ivey talked to you about the testing methods used in the various studies that we've talked about here today, and that you cite in your report, and he emphasized the fact that those all were predicated on, for lack of a better term, known activity, that in those studies that they knew that a person was walking and they could analyze the data to determine if the data captured by the phone correlated with the known steps taken.

**A**     That's correct.

**Q**     All right.  And I think he asked you on cross-examination if this real-world or uncontrolled, non-controlled environment made the data less reliable.

Is that a fair assessment of what he was asking you,

**Hyde (Redirect)**

you think?

**A**     I believe that's what he was asking.

**Q**     And that's a little bit like a if a tree falls in the woods, does it make a sound question.  Right?  Isn't it?

Because if we have the testing that we've looked at here and we know that when controls are in place to be able to accurately analyze the data, the data is accurate.

Is there anything that you are aware of to indicate that when those controls aren't in place the data would somehow suddenly become less reliable and accurate?

**A**     The reliance of steps shouldn't become more or less reliant because of external situations that we could -- we could test for any specific situation.  If there was a concern or a statement that some other specific activity was taking place, we could test for that.

So if there -- but, like you said, if a tree falls in the woods and no one hears it, of course, we don't know what could happen with complete unknown.  But we do know what happens because we've tested and we have digital traces.

And that is exactly the foundation of the digital forensics science in conducting that testing so that when we do have an unknown, which is a mobile device that we recover in any case, that we can apply those standards from the testing to that data to more accurately represent what had happened.  That's the whole purpose of the digital forensic

**Hyde (Redirect)**

science.

**Q** And, broadly speaking, that's the purpose of the scientific method, is it not?

**A** Absolutely.

**Q** To perform controlled experiments to explain and determine what happens in an uncontrolled environment?

**A** That's correct.

**Q** Mr. Ivey talked to you about Defense Exhibit A, which is this van Zandwijk article from, I believe, 2023 in which they talk about the limited research on, I think they call it, free-living or free-living conditions.

Is that right?

**A** That is correct.

**Q** And I would just note, and I think you did note this, that's the same author that found step counts to be reliable with an average error of about two percent?

**A** That is correct.

**Q** And even in this article where they talk about the limited research of free-living condition analysis, there's nothing to indicate that a free-living situation is less accurate than the controlled testing that's been done?

**A** That is correct.

**Q** It's just saying --

**A** There's a lack of testing.

**Q** -- that testing hasn't been done?

**A**      That is correct.

**Q**      Mr. Ivey talked to you about the fact that you didn't review other evidence in the case.  And you talk about in your report the items that were provided to you but that you did not look at or make part of your analysis.

**A**      That's correct.

**Q**      Why did you not feel the need to look at that other evidence when doing a digital forensics analysis?

**A**      I didn't want to introduce any bias from the other evidence, especially the screen captures of the health data, et cetera.  I didn't want to introduce anything that would affect my results.

**Q**      All right.  So your findings of step counts and distance traveled, et cetera, comes solely from the data, they are not influenced by what you may have seen on a surveillance video?

**A**      I did not watch the surveillance videos.

**Q**      Okay.  You were asked about the fact that there are -- have been updates to digital forensic extraction tools since the extraction on this phone was done?

**A**      I responded to that question, yes.

**Q**      Okay.

**A**      Of course.

**Q**      And you said that you have used in -- or you did use in your analysis the up-to-date versions of the forensics

**Hyde (Redirect)**

tools that you used?

**A**     Yes.

In extraction, though, once you have the full file system, a different extraction isn't going to change -- well, I mean, you'll lose data, because there's temporal data that goes away, but the full file system was the most complete extraction for that device and sill is today.  So a change in extraction tool wouldn't change anything.

But in terms of digital forensics tooling, yes, that changes, and I've used updated tools.

**Q**     All right.  And so, that was my question.

Was there any data that was contained on this physical phone that was not available to you to do a forensic analysis?

**A**     No.

**Q**     And no matter what version of extraction tool was used by law enforcement, you were given the entire contents of that phone; is that right?

**A**     I was given the most complete extraction available.

**Q**     Okay.  You noted in your report, and you were asked about this, that there were two identical SQLite secure databases?

**A**     That's correct.

**Q**     They had the same hash value?

**A**     That's correct.

**Hyde (Redirect)**

Q    Does that have any effect on the reliability of your analysis?

A    No.

Q    And does it indicate in any way a corruption of the data?

A    No.

Q    And, in fact, the fact that they had the same hash value would indicate there was no corruption or change in the data between the two copies; is that right?

A    That is correct.

Q    You indicated on cross-examination that you don't have a certification related to Apple Health data.

A    Yes.  None exists.

Q    And that was my question.

Does any such certification actually exist?

A    No.  Not to the best of my knowledge.

Q    You testified that you don't know how Apple defines a step?

A    That is correct.

Q    And so, when we have data like in your report where we see, for one example, a registration of 208 steps, do you know how the forensic data defines a step?

A    It's what we understand from the testing from people like van Zandwijk.

Q    Right.

**Hyde (Redirect)**

So from the testing, we know that when a person takes a step, within about a two percent error rate, the phone registers that as a step?

**A**     Correct.

**Q**     All right.  So we're not talking about, you know, Apple is only registering a step as sort of a broad jump, where we're taking big leaps, based on the testing, Apple seems to register a step as what we commonly understand to be a step by a person?

**A**     That is correct.

**Q**     Talking about this cache-encrypted c.db, Mr. Ivey asked you about granularity, and you distinguished between granularity and reliability.

Can you explain that answer, please.

**A**     So granularity would be are we measuring something in nanoseconds versus milliseconds.  It doesn't make anything more correct or wrong, it's just the precision of the measurement.  Right?

So if we were to look at a clock and say I'm going to meet you at 8:30 and 30 seconds, and somebody else says, I'll meet you at 8:30, we can understand that what the intent is is very similar in both.

And if we have a measurement of time or a measurement of distance that goes to a different precision, it doesn't make one less accurate.  It just means that it's to a

**Hyde (Redirect)**

different decimal point.

**Q**     All right.  So, for example, again, looking at your report in Government Exhibit 1 --

**A**     Uh-huh.

**Q**     -- the chart on page 3, we have a start -- a time start of 8:18 and three seconds, and a time end of 8:28 and three seconds.

So a ten-minute interval?

**A**     That's correct.

**Q**     And so, if we were to get more granular, we might have a start time of 8:18:03 to 8:19:03, a one-minute breakdown?

**A**     Correct.

**Q**     And there would be a reading of how many steps were taken in that one minute?

**A**     Correct.

And then we would have another entry for the next set of minutes, and then you would correlate them, and then they would fit in this.  So it's more -- it's just a smaller precision.

**Q**     Okay.  So we're not talking about the fact that the SQLite database is less reliable or captures less reliable data than the cache-encrypted database, we're just talking about smaller intervals of time perhaps?

**A**     Correct.

**Q**     All right.  And then, the last thing, I just want to

**Hyde (Redirect)**

distinguish, because I think there was a little bit of confusion.

The phone that you -- or the phone from which the data was extracted in this case was an iPhone 14?

**A**    Correct.

**Q**    But when you talk about it was running version 18.0.1, you're talking about the operating system on the phone; is that correct?

**A**    Correct.

**Q**    All right.  So we're not saying that Whiffin used an 18.1 and you were using a 14?

**A**    Those are non-corollaries.  That's apples and oranges.

**Q**    Right.

**A**    Yeah.

**Q**    So we're talking about the model of the phone being an iPhone 14?

**A**    Correct.

**Q**    And the operating system being updated as far as 18.0.1?

**A**    That's correct.

**Q**    All right.  And so, operating systems are continuously being updated by Apple on their iPhone models; right?

**A**    That's correct.

**Q**    And so, the operating system doesn't correlate with the number of the iPhone model?

**A**    That's correct.

**Q**    So when Whiffin is analyzing an 18.1 operating system for his step count analysis, the phone you were analyzing had been running 18.0.1?

**A**    Correct.

**Q**    So those two operating systems are very close in sequence; is that right?

**A**    Relativity.  Relatively.  I can't say that word.  You know what I mean.

**Q**    All right.  So they're both in operating system 18 dot --

**A**    Yes.

**Q**    -- some version of 18?

**A**    Yes.

**Q**    Okay.

AUSA PETER DALY:  Nothing further.  Thank you.

THE COURT:  All right.  Mr. Ivey, any recross?

ATTORNEY TIMOTHY IVEY:  No recross, Your Honor.  Thank you.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you, Your Honor.

(Pause in Proceedings)

THE COURT:  I'm checking.  Do we have an

existing trial date at all now?

AUSA PETER DALY:  I don't believe so, Your Honor.

ATTORNEY JUSTIN ROBERTS:  No, we don't, Your Honor.

This was the only thing on the schedule from the last time.  And then we would, after today's hearing, set that.

THE COURT:  Okay.  What I intend to do is either to get -- come back and give you an oral order in regard to my ruling or a written one, and I'm not sure which one I'm going to do now.  I'm not going to do that right this minute.  But I guess we need to think about time frames and so forth.

Other than this issue regarding the experts, are there any other outstanding issues related to whether we can go to trial relatively soon?

ATTORNEY JUSTIN ROBERTS:  No, Your Honor.

I didn't understand.  Did you -- did the Court say you were going to make a decision today on this?

THE COURT:  No, I did not.

ATTORNEY JUSTIN ROBERTS:  Because we would actually, if anything else, like the opportunity for maybe some additional briefing on some of what we heard here today and some of what's come out.

For instance, Your Honor, the five-page report we were

given as part of this notice, the conclusion stated was significant activity from 8:15 to 9:00 on this day.  But the testimony is different now in that the conclusion is that step counts stored is accurate enough to be utilized, distance traveled when utilized when applying an error rate is sufficient for admissibility.

That was not in the report.  That's -- you know, it's a lot of what we've -- we'd like the opportunity to pull out some of the information from today's testimony and some of the articles that have been cited before the Court makes a decision.

THE COURT:  Well -- and if I were to allow that, how much time do you need?

ATTORNEY JUSTIN ROBERTS:  I think we need -- I think we would need a few weeks.  I think all of us would benefit from the transcript of today's proceedings.

So I would say two or three weeks, Your Honor.

THE COURT:  Okay.

ATTORNEY JUSTIN ROBERTS:  A little bit more time would be better on that.

But given that this is something, you know, that we've spent a lot of time on, it's worth some additional briefing and argument, either oral argument and/or briefing or both.

THE COURT:  Well, I -- right now, I'm just -- let's think about the briefing.

ATTORNEY JUSTIN ROBERTS:  Okay.

THE COURT:  And, Mr. Daly, do you have any comments?

AUSA PETER DALY:  Your Honor, I would ask for an opportunity to respond to whatever briefing comes in.

THE COURT:  Sure.

AUSA PETER DALY:  So if it's going to be two to three weeks, I would just ask for the same amount of time to respond.

THE COURT:  Okay.  All right.  Mr. Roberts, well, be specific now, what --

ATTORNEY JUSTIN ROBERTS:  Your Honor, today is Monday, so I would say three weeks from today.

By the time we get the transcript, and in light of some other schedules, three weeks from today to have something to the Court.

THE COURT:  What date is that?

ATTORNEY JUSTIN ROBERTS:  I believe that's April the 20th, Your Honor.

THE COURT:  All right.  Mr. Daly, if I were to give them that amount of time, look at your calendar.

AUSA PETER DALY:  I think three weeks from that date puts us at May 11th.

THE COURT:  May 11th?

AUSA PETER DALY:  Yes, Your Honor.

THE COURT:  All right.  And -- okay.  I'll -- I'll allow it, if that's what you want.

The parties want a more -- more briefing on it.  That would include the possibility for both sides to have copies of the transcript and for the Court to have a copy of that as well.

AUSA PETER DALY:  I guess my only indication, Your Honor, the Government is not asking for additional briefing.  I think we're just asking for an opportunity to respond to the briefing.

THE COURT:  I understand.

AUSA PETER DALY:  I don't know that additional briefing is necessary, particularly on this issue about the report.  I think that's an issue that goes to -- quite frankly, I don't know.  She's -- Ms. Hyde has testified today to her findings, to the methods underlying it.  I mean, if we're on a *Daubert* hearing, we're not talking about what's in her report as far as is it, you know, enough.  We're talking about reliability and relevance.

So I don't know if the additional briefing is necessary, but if the Court is going to grant it, then, yes, we would ask for the additional three weeks as well.

ATTORNEY JUSTIN ROBERTS:  Your Honor, in preparation for the hearing, last week, we -- and it was discussed this morning, I mean, the -- the issue of using

Apple data, whether it's health data or location, has been the subject of *Daubert* hearings, including this particular proposed expert, in other cases.

So, at a minimum, we would like to be able to cite to, get those cases before the Court.  They'd come to our attention I believe late last week.  And Massachusetts and Maryland were discussed here during this morning's testimony.  So there is some additional information to provide, both in terms of legal precedent -- some of what was stated here this morning is at the heart of the issue in those cases as well.

THE COURT:  All right.  Although, let me say, that if you had some cases that you thought were particularly pertinent, I will just say, it would have been helpful to have them as I was sitting here.  But, you know, we'll go with the extension.

But you know what I mean.  We're sitting here trying to figure out whether there are other cases similar to these so that we can draw up whatever information we can from them that would be pertinent, and -- but we don't have it.

So Mr. Dawson -- you're asking on behalf of Mr. Dawson for the extension.  And so, I'm going to grant it.  Defendant's asking for it.  And Mr. Daly is not asking for it, but he is not objecting to it.  Although, he cited reasons why he thought it maybe wasn't necessary.

So I will make an ends of justice finding in regard to this.

Mr. Dawson understands that this means that getting to a possible trial, if that's what we're going to have, is taking longer, and that the time to get through all of this obviously means it's going to be later in terms of when a trial might occur, if it was going to occur.

You understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And your lawyers are asking on your behalf because they feel it's in your interest, obviously, to have this extension.  I know they probably talked to you about it.

But do you have any quarrel with that at all?

THE DEFENDANT:  No.

THE COURT:  All right.  I don't -- let me say, I don't anticipate the need for a reply.  Both parties have been here.  They have made arguments.  We've got the transcript.

I think I could, from reading whatever you submit to me, figure out what the opposing arguments would be, because the context has already been developed.  And so, I think that would be sufficient just to have the briefing and have the briefing in the sequence that we've talked about.

I don't know how long it will take me to rule on it,

but I'll give it some priority.  But I think we should include a period of 30 days, and then, if there's anything more I need, I will come back to you.  But a period of 30 days for possibly ruling on the motion.

So I'm going to include that in the determination as well.  I'm going to talk about the briefing and the ruling by the Court.  That doesn't mean that I will render an opinion within that period of time, but I'm just putting -- trying to put a reasonable time frame on it.  Like all of us, sometimes the time frames are not precise.  So that's what I'll do.

Anything else, Mr. Ivey, from your -- from the defense standpoint?

ATTORNEY TIMOTHY IVEY:  No, Your Honor.

THE COURT:  All right.  Mr. Daly.

AUSA PETER DALY:  Nothing, Your Honor.
Thank you.

THE COURT:  All right.  Well, thank you all.
Oh, and make sure -- I do have the exhibits.

I think all the exhibits were attached to your -- to your opposition brief; right?

AUSA PETER DALY:  So Exhibits 1 and 2 were.
3, 4, 5, and 6 were not attached.  Those are the articles.  And I have copies to submit to the Court.

THE COURT:  Yeah.  I just want to make sure I

have those in hand.  And I have a copy of Defendant's Exhibit A.

And that was the only exhibit from defendant; is that right?

ATTORNEY JUSTIN ROBERTS:  Yes, Your Honor.

THE COURT:  Okay.  That will be all for today.  Have a good lunch.

AUSA PETER DALY:  Thank you, Your Honor.

COURTROOM DEPUTY:  All rise.

- - -

(Proceedings concluded at 12:16 p.m.)

**C E R T I F I C A T E**

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter prepared from my stenotype notes.

*/s/ Sarah Derbin*                                    *4/7/2026*
SARAH DERBIN, FAPR, RDR, CRR, CRC              DATE