# IN THE CIRCUIT COURT OF MARYLAND FOR MONTGOMERY COUNTY

| | | |
|---|---|---|
| **STATE OF MARYLAND** | : | |
| | : | |
| v. | : | **Case No: C15-CR-24-000199** |
| | : | |
| **TYRESSE HERRERA** | : | |
| **Defendant** | : | |

## Opinion

This matter initially came before the court for a Motion hearing on November 15, 2024, on the Defense Motion to Exclude Expert Testimony Regarding Location Data Obtained from Forensic Cell Phone Extraction at Trial, filed on September 19, 2024. Defendant's Motion was filed pursuant to Md. Rule 5-702 and *Rochkind v. State*, 471 Md. 1 (2020), challenging the methodology utilized in obtaining and/or generating location data pertinent to this case. Defendant's Motion known colloquially as a Daubert Motion was opposed by the state, with an opposition filed on November 13, 2024.

## Background

The defendant Tyresse Herrera is charged with attempted first-degree murder, use of a firearm in commission of a crime of violence and illegal possession of a regulated firearm. The charges stem from a shooting which occurred on October 25, 2023, at Stewartown Local Park in Gaithersburg, Maryland. Upon his arrest, Mr. Herrera's Apple iPhone was seized, and pursuant to a search warrant, a forensic extraction was conducted. The defense was provided with the forensic extraction of the cell phone seized from Mr. Herrera. Along with the forensic extraction, the State provided Notice of its intent to present expert testimony as to the forensic extraction. Three forensic examination reports were provided with information generated from the forensic extraction. The reports provided, specifically, Defendant Exhibit #1 – indicated

1

**EXHIBIT B**

"Significant Locations Visits" and listed vicinity entry dates, times, vicinity exit date and time, latitude, longitude, and an accuracy score. Defendant Exhibit #2 – indicated "Apple Maps Trips" and listed start date, time, end date, time, latitude, and longitude points. Defendant Exhibit #3 indicated "Significant Locations" and listed the location name and address of Stewartown Local Park along with the latitude and longitude points. The three forensic examination reports contained no narrative information as to the data provided in the reports. The crux of the reports is that the significant location data from his phone placed Mr. Herrera at Stewartown Local Park at or about the time of the shooting.

Defense counsel filed the instant Motion seeking to preclude the noted expert testimony as to the location information obtained by way of the forensic extraction. Defense cites to Md. Rule 5-702 as to expert witnesses, specifically (3) whether a sufficient factual basis exists to support the expert testimony. Citing *Rochkind,* defense counsel points out that expert opinion testimony must be based on an adequate supply of data as well as a reliable methodology. *See* 471 Md. at 22.

It is important to note that the location history issue in this case is not one involving the cell site location information, which can be obtained from a cell phone carriers' call detail records and billing records and then used to plot locations based on cell tower connections/communications. Cell site location data has been found to be reliable and admissible in court by way of expert testimony. The specific issue under scrutiny in the defense motion is the specific locations history data, which is derived from a native Apple application.

Defense counsel challenges the methodology used to generate the latitudinal and longitudinal coordinates, which comprise the significant location history data. Counsel contends that Apple, the cell phone manufacturer, utilizes a proprietary algorithm to generate this information. As it is proprietary, it cannot be adequately tested; as it is proprietary, it is not generally accepted in the scientific community. Therefore, the methodology is not reliable and cannot be the basis of expert opinion testimony in trial.

2

Exhibit B - Page 2 of 8

The State opposes the Motion and contends that the testimony of its expert witness satisfies *Rochkind* and *Daubert*. The State's expert has independently confirmed the significant location data information from the extraction and thus contends the methodology is tested and reliable. Additionally, the expert noted that she had previously performed her own independent testing on a similar IOS version and could attest to the accuracy of the significant location history.

Interestingly, it appears that this is an issue of first impression in the State of Maryland. The issue of the reliability of data or methodology in obtaining the data regarding frequent location history, the predecessor of significant location history, is a relatively new concept. This issue has been considered and addressed most recently in a Massachusetts case. *See Commonwealth v. Arrington*, 493 Mass. 478 (2024). In *Arrington*, following a 3-day evidentiary hearing, the trial court did not allow the introduction of frequent location history data retrieved from the defendant's cell phone. *See id.* at 497. The court found that "there was no scientific literature or adequate testing to support reliability." *See id.* at 493 (finding "even if the inputs used by the FLH algorithm are generally deemed reliable, the FLH data outputs are not ipso facto reliable, especially where there is not scientific literature or adequate testing to support reliability.").

In this case, an evidentiary hearing was held over the course of two days. The court heard testimony only from the State's expert, Ms. Jessica Hyde. Ms. Hyde is the owner/founder of Hexordia. She conducts digital forensic investigations primarily specializing in mobile forensics and Internet of things devices. Per her curriculum vita, admitted as State's Exhibit #1, Ms. Hyde has years of experience and expertise in digital forensics and was readily accepted as an expert of digital forensics in mobile devices.

In assessing the reliability of an expert's methodology, the court must consider several factors as provided in *Rochkind*, by way of *Daubert*. The factors include, but are not limited to:

1. Whether a theory or technique can be (and has been) tested;

3

2. Whether a theory or technique has been subjected to peer review and publication;

3. Whether a particular scientific technique has a known or potential rate of error;

4. The existence and maintenance of standards and control;

5. Whether a theory or technique is generally accepted;

6. Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of litigation, or whether they have developed their opinions expressly for purposes of testifying;

7. Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion

8. Whether the expert has adequately accounted for obvious alternative explanations;

9. Whether the expert is being careful as he or she would be in his/her regular professional work outside of his/her paid litigation consulting; and

10. Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Rockind*, 471 Md. at 36.

According to the State's expert, which the court accepts, this area of digital forensics, specifically frequent history records and significant location data was first identified in a research publication in 2017. Per Ms. Hyde, the peer review of this research has only recently been completed in late 2023, early 2024. She is aware of no other peer review conducted on this research topic/artifact. She testified that she conducted what appeared to be a thorough search and was unable to locate any other than the peer review most recently completed in 2024. In addition, Ms. Hyde testified that there were no scholarly articles that specifically speak to significant locations.

Per *Daubert*, a pertinent consideration is whether the theory or technique has been subjected to peer review and publication. *See* 509 U.S. at 593. Publication is one element of peer review; it does not necessarily correlate with reliability. *See id.* But submission to the

4

Exhibit B - Page 4 of 8

scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. *See id.* at 593-94. The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised. *See id.* at 594.

In explanation for the lack of peer reviews, Ms. Hyde offered that "...in order for work to get accepted in peer review journals, it is understood that it needs to be novel. So, it is not uncommon to have only one peer review article on a specific topic because once something has been peer reviewed by one person – by one journal that's been created and peer-reviewed by the community, it's no longer novel. So, it's unlikely to see additional peer reviewed articles on the precise same topic." (11/15/24 Hearing Transcript p. 40; lines19-25).

In the court's admittedly limited knowledge, the purpose of the peer review process is to subject the scientific information to extensive scrutiny by other experts in the same field. The technical and scientific accuracy must be assessed/ analyzed/dissected – it would seem that the rigor of the process requires/relies/assumes that there will be more than one peer review in a new scientific area, particularly if a novel topic. Additionally, the fact that the peer review inquiry is a listed factor for the court' consideration in assessing reliability of methodology under the Daubert analysis, seems to presume more than one peer review is the standard or norm.

In addition to her review and confirmation of the forensic extraction performed by the Montgomery County crime lab, Ms. Hyde testified that she personally conducted a research experiment in a real-world scenario, unrelated to this case. Having previously conducted such an experiment, she relied on her notes and data set from her prior testing. In her experiment, she took an iPhone 7 running 15.8 IOS, with no SIM card, wiped the device of all pre-existing data, and then over a period of days visited different locations and took contemporaneous notes

5

as to the device's location.  The device she used was jailbroken, meaning security measures were bypassed.

Ms. Hyde testified that her personal "real world scenario" testing was a basis for her opinion that the methodology in this case is reliable.  She testified that while she did not conduct new testing on Mr. Herrera's device, she used her notes and her data set from her personal testing.  However, in Mr. Herrera's case the phone in question was an iPhone 6S running 15.7.2 IOS, with no SIM card, had not been wiped of preexisting data, and was not jail broken. The phones are not the same model, the operating systems are not the same, and with the exception of neither phone having a SIM card, the other settings are not identical.  Notably absent was testimony as to similarities or parallels that exist between the iPhone 6S and 7 models which would explain yielding the same test result; she did not testify as to any similarities or parallels between the operating systems 15.7.2 and 15.8 which would explain why testing would yield the same results.

While Ms. Hyde explained her testing, done for peer review purposes, she provided no correlation to explain or acknowledge differences or similarities in the devices.  Moreover, she did not retain her notes, her data set, or the computer used to conduct her testing which forms the basis of her opinions.  She acknowledged that Apple is continually updating its operating systems and settings.  Under the circumstances, the court is left to rely on or accept the *ipse dixit* opinion of the expert.

The issue raised in this case stems from the fact that Apple's algorithms are proprietary, and the expert did not have access.  While Ms. Hyde is certainly knowledgeable on the subject of significant locations data, she acknowledged limitations due to Apple's proprietary algorithm such as: she is unable to determine the specific sources of the location data which make up significant locations; she does not know the number of data points Apple is using for significant locations; she does not know the level of priority in the data points used; and she has no idea

6

how Apple generates a confidence score as to the coordinates provided. These unknowns flow from the proprietary algorithms.

The reliability of the methodology for the data provided is of paramount concern for both parties. As it should be. While the reliability inquiry for expert testimony is flexible, reliability cannot be presumed.

When determining the reliability of proffered expert testimony, the trial court must focus on principles and methodology, not on the conclusions they generate. *See Abruquah v. State*, 483 Md. 637, 655 (2023) (citing *State v. Matthews*, 479 Md. 278, 311 (2022)). However, conclusions and methodology are not entirely distinct from one another. *See id.* Thus, the trial court must consider the relationship between the methodology applied and conclusion reached. *See id.*

> Under *Daubert*, trial judges are not required to make a determination of the ultimate scientific validity of any scientific propositions; instead, they need only make a much more limited inquiry of whether sufficient indicia of legitimacy exist to support the conclusion that evidence derived from the principle may be profitably considered by a fact finder at trial

*Rochkind* 471 Md. at 16. The trial judge is charged with the responsibility of a "gatekeeper." *See id.* at 20. With a screening and oversight role, the gatekeeper must ensure the expert's testimony rests on reliable foundation.

In this case, there are a number of unknowns. Too many for this gatekeeper. Before a fact finder, the unknowns could easily result in a default to acceptance, which is not appropriate or consistent with the quality required and expected in scientific/technical evidence. There are too many opportunities for the fact finder to simply rely on the expert's verbal confidence as opposed to reliable methodology.

The State has the burden of persuasion by a preponderance of the evidence. The Court having considered the *Daubert* factors, the evidence presented and arguments of counsel, finds that the State has failed to meet its burden. Accordingly, Defendant's Motion to Exclude expert

7

Exhibit B - Page 7 of 8

testimony regarding the significant location data obtained from the forensic cell phone

extraction is GRANTED.

**JILL R. CUMMINS,** Judge
Circuit Court of Maryland for Montgomery County, MD

Entered: Clerk, Circuit Court for
Montgomery County, MD
March 6, 2025

8

Exhibit B - Page 8 of 8