IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 5:25CR173 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEMAR DAWSON, | ) | UNITED STATES' POST-HEARING |
| | ) | BRIEF IN OPPOSITION TO |
| Defendant. | ) | DEFENDANT'S *DAUBERT* MOTION |
| | ) | |
| | ) | |

Now comes the United States of America, by and through counsel, David M. Toepfer,

United States Attorney, and Peter E. Daly, Assistant United States Attorney, and hereby files its

post-hearing brief in opposition to Defendant's motion pursuant to *Daubert v. Merrell Dow*

*Pharmaceuticals*, 509 U.S. 579 (1993), to exclude evidence and testimony regarding Apple

Health data extracted from Defendant's cellular phone.  (*See* ECF # 26: Motion, PageID 100-06;

ECF # 31: Supplement, PageID 135-37).

### A. Digital Forensic Examiner Jessica Hyde is Qualified to Provide Expert Testimony Regarding Digital Forensic Analysis and Her Analysis of Defendant's Apple Health Data in This Case

Defendant's post-hearing brief offers no challenge to digital forensic examiner Jessica

Hyde's qualifications to testify as an expert in digital forensics analysis, nor to her ability to

provide expert testimony regarding her analysis of the Apple Health data extracted from

Defendant's iPhone, if such evidence is deemed admissible.  Instead, Defendant focuses only on

the reliability of Apple Health data and an alternative argument under Rule 403.  Therefore, the United States will rely upon the arguments set forth in its response to Defendant's motion for a *Daubert* hearing (ECF # 34: Response, PageID 168-70), and Ms. Hyde's hearing testimony regarding her training, education, and work in the field of digital forensics, (ECF # 38: Hearing Trans., PageID 218-36), all of which clearly demonstrate her ability to testify as an expert in digital forensic analysis regarding her analysis of the Apple Health data in this case.

**B.  The United States Has Shown that Apple iPhone Health Data is Both Relevant and Reliable**

Through its response in opposition to Defendant's motion for a *Daubert* hearing and the testimony of digital forensic examiner Hyde provided at the hearing before this Court on March 30, 2026, the United States has shown, by at least a preponderance of the evidence, *see Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001), that the Apple Health data extracted from Defendant's cellular phone is both relevant to facts at issue in this case and is based upon reliable principles and methodologies.  Therefore, such evidence is admissible pursuant Rule 702 of the Federal Rules of Evidence and *Daubert*.

**1.  Scientific testing has repeatedly demonstrated the accuracy of Apple Health data**

The studies cited in Ms. Hyde's report and discussed in greater detail during her testimony at the *Daubert* hearing before this Court have all addressed the accuracy of the Apple Health data at issue in this case.  In the 2019 peer-reviewed study by van Zandwijk and Boztas (Gov. Ex. 4), the authors found that the steps registered by the Apple Health app during repeated testing with different iPhone models under various conditions showed an error rate of only approximately 2% when compared to manually measured steps.  (ECF # 38: Hearing Trans., PageID 249-51; Gov. Ex. 4, pp. S126, S128-129).  The authors noted that that error rate was consistent with the findings of two previous similar studies regarding step counts in Apple

2

Health data.  (Gov. Ex. 4, p. S129).  Therefore, they concluded "that all three iPhone[s] [used for testing] are accurate devices in registering the number of steps over a wide range of number of steps, walking speeds and carrying locations."  (*Id.*).

That same 2019 peer-reviewed study also examined the accuracy of distances registered by the iPhone Health app.  While the authors found that the accuracy of the distance information was less accurate than that of step count, they were able to make some valuable conclusions about the reliability of the distance data as forensic digital evidence.  First, they determined that the distances registered by the Health app differed by up to 30-40% when compared with manually measured distance.  (*Id.*, p. S126).  Even with that difference, however, the authors concluded that the distance data could still be useful evidence in differentiating between two significantly different possible paths of travel.  Specifically, they concluded, "Without prior knowledge of walking speed and carrying location, the likelihood of the digital traces might be the same if the lengths of the two routes under consideration are not too different.  On the other hand, when the two distances differ considerably in length, meaningful probability statements can be formulated."  (*Id.*, p. S132).

In addition to the 2019 van Zandwijk and Boztas study, the 2025 study by Ian Whiffin also examined the accuracy of Apple Health step and distance data.  (Gov. Ex. 5).  Through testing using multiple iPhones in a variety of carrying locations (left pocket, right pocket, handheld), Whiffin reached conclusions similar to those of the 2019 study.  Specifically, he determined that step data was highly accurate, differing from manually measured step counts by only 2-7 steps over a total of 237 measured steps, an error rate of 1-3%.  (*Id.*).  Also like the 2019 study, Whiffin found that distance data less accurately matched manually measured distance, but did accurately show periods of movement.  (*Id.*).

Importantly, neither van Zandwijk/Boztas nor Whiffin found any indication that the Apple Health data registered distance traveled when no movement occurred.  That is, neither study indicated that the app falsely registered a distance traveled by a stationary iPhone.  Thus, as Ms. Hyde testified at the hearing before this Court, while the measurements captured by the data may not always accurately reflect true distance traveled, the logging of a distance traveled by the app is "indicative that movement occurred at that time."  (ECF # 38: Hearing Trans., PageID 251-52).

Finally, research has shown that the flights climbed data collected by the Apple Health app is also reliable and accurate.  In both her report and her testimony, Ms. Hyde referred to a 2025 study by Whiffin and a 2023 peer-reviewed study by van Zandwijk, Lensen, and Boztas which examined the accuracy of such data.  (Gov. Ex. 5, pp. 3-6; Gov. Ex. 6, pp. 2-7; ECF # 38: Hearing Trans., PageID 256-57, 259-61, 267).  The authors of both studies found that an increase in elevation of three meters registers as a flight climbed in the Apple Health data.  (Gov. Ex. 5, pp. 3-5; Gov. Ex. 6, pp.1-2, 7).  Van Zandwijk, Lensen, and Boztas also concluded that the Health app accurately registered flights climbed, using the three-meter measurement of a flight, under "normal everyday conditions" in 70-80% of the tests.  (Gov. Ex. 6, pp. 6-7).  The app was also accurately able to distinguish between changes in elevation while climbing stairs and while riding an elevator or escalator, registering flights climbed on stairs, but not while passively riding an elevator or escalator.  (*Id.*, pp. 2, 6-7).

Thus, multiple studies have concluded that Apple Health data can reliably be used as evidence of movement by the user of a particular iPhone.  As noted, Apple Health step counts are highly accurate in measuring the true number of steps taken by the user over a particular time.  And although distance data provides less accurate measurements of distance traveled, it is

4

a reliable indicator of movement and a reliable source of information when error rates and other factors are accounted for.  Notably, because this case presents two significantly different possible paths of travel by Defendant at the time of the alleged arson, the 2019 van Zandwijk and Boztas study supports the use of the distance data collected by Defendant's phone as reliable evidence. That is, the government's theory of the case is that Defendant walked from his house to the arson location and back during the timeframe of the fire.  By contrast, Defendant stated to investigators and now confirms in his post-hearing brief that he "denies taking any route to his neighbor's residence."  (ECF # 40: Def. Post-Hearing Br., PageID 329).  Thus, there are two significantly different possible routes – across the street and back versus no travel at all.  Defendant himself concedes that "under those circumstances, the studies do suggest that there is a measure of reliability to the steps in the Health App." (*Id*.).  During the arson timeframe, Defendant's Apple Health data registered 428 steps taken and a distance traveled of 268.11 meters.  (Gov. Ex. 1: Hyde report, p. 4).  Using the distance data from Defendant's phone, therefore, "meaningful probability statements can be formulated" regarding which of the two possible routes is more likely to have been taken.

    **2.  Defendant's attacks on the reliability of Apple Health data are without merit**

In his post-hearing brief, Defendant asserts that Apple Health data like that extracted from his iPhone does not meet the *Daubert* standard for admissibility.  Notably, Defendant cites no study indicating that step counts, distance, or flights climbed data captured by the Apple Health app are unreliable for use as evidence.  Nor has he presented any expert opinion challenging or disagreeing with that of Ms. Hyde.  Rather, Defendant attempts to attack the reliability of the data by critiquing and selectively quoting the studies upon which Ms. Hyde relied.  His efforts do not show that the data is unreliable.

First, Defendant challenges the reliability of step counts in the Apple Health data. Defendant does not argue that the app incorrectly measures steps. Nor could he. As noted above, repeated studies have shown that the app accurately measures step counts with an error rate of approximately 2%. Instead, Defendant contends that the studies themselves cannot prove the reliability of the step count data because they were done in controlled experiments rather than in uncontrolled real-world scenarios. (ECF # 40: Def. Post-Hearing Br., PageID 327-29). According to Defendant, unless a person is independently known to have taken steps, the step counts in that person's Apple Health data cannot be used to prove steps were taken.

But the premise of his critique is invalid. Indeed, he is essentially challenging the scientific method, generally. Controlled experiments are the method by which any scientific testing is done because in order to reach evidence-based conclusions, researchers must be able to identify and control for a variety of conditions. Indeed, Defendant's assertion that the accuracy of step counts in experimental conditions cannot be applied to show the reliability of step counts, generally, is demonstrably false when compared to other widely accepted scientific testing. For example, courts routinely rely on the accuracy of evidence from testing for the presence and levels of controlled substances in a person's blood. The reliability of that testing was necessarily confirmed through controlled experiments. That is, researchers had to take a subject who was known to ingest a known quantity of a particular substance. That subject's blood would then have been tested to determine whether the testing method used could accurately determine the type and quantity of the substance ingested. Once a testing method was determined to be accurate in this manner, it could then be used to accurately show drug use by persons outside of the experimental setting.

6

By Defendant's logic, however, unless a person was independently known to have taken a particular drug, a positive test for that drug could not be used to prove drug use. But that is simply not true. Whether in drug testing, DNA analysis, or even routine medical testing, when a testing method is proven reliable in a controlled experimental setting, it is then regularly relied upon to produce similarly accurate results in non-experimental applications. Defendant's attempt to show that the scientific method should apply differently to Apple Health data is without merit.[1]

To bolster his argument, Defendant quotes selections from the 2019 van Zandwijk and Boztas study. With regard to the accuracy of step count data, those authors concluded that the testing results confirmed "that all three iPhone[s] [used for testing] are accurate devices in registering the number of steps over a wide range of number of steps, walking speeds and carrying locations." (Gov. Ex. 4, p. S129). Defendant, however, states: "The report explicitly cautions that the presence of steps or distance in the Apple Health App do 'not necessarily indicate that walking or running has taken place while carrying the telephone, since under specific conditions there might be false positive registrations in the Health App.'" (ECF # 40: Def. Post-Hearing Br., PageID 328 (quoting Gov. Ex. 4 at p. S132)). But this partial quotation both slightly misstates the authors' actual words in the context of the full sentence, and leaves off their additional comment regarding the "specific conditions" that might result in false positive registrations. Read in the full context, the authors stated:

---

[1]      Defendant notes that the 2019 van Zandwijk study cites a 2018 study which questioned the accuracy of step counts in "free living conditions." (ECF # 40: Def. Post-Hearing Br., PageID 328). Defendant neglects to note that in citing that study, van Zandwijk points out that the Health data accuracy was determined by comparison to a commercial accelerometer whose accuracy was not known, and that the study authors attributed at least some of the discrepancy to user behavior such as not always carrying the iPhone during walking breaks. Thus, the 2018 study can hardly be considered reliable evidence to support Defendant's experimental conditions argument.

> From the results presented in the Section *Experimental Results* we conclude that it is possible to use this data from the Health App for forensic purposes in cases where it is known (or assumed) that walking or running has taken place. It is important to note that the converse need not always be necessarily true: if steps or distances are registered by the Health App, this need not necessarily indicate that walking or running has taken place while carrying the telephone, since under specific conditions there might be false positive registrations in the Health App. For instance, initial research at NFI indicates that sometimes steps can be registered when driving in a car over speed bumps.

(Gov. Ex. 4, p. S132).

The context here is critical.  While it is clear that the authors note that their study was confined to analyzing the accuracy of results from controlled testing, their conclusion is not, as Defendant asserts, that the presence of step or distance data *does not* indicate that walking occurred.  Instead, they state that the presence of such data *need not necessarily* indicate walking or running.  The distinction is important – Defendant's rephrasing suggests that the presence of such data *cannot* be relied upon to indicate walking; the authors' statement is that in some circumstances the presence of the data *may* not indicate walking.

The authors' intent is further demonstrated by the example they provide of "specific conditions" which might lead to false positive registrations: "driving in a car over speed bumps." (*Id.*).  Indeed, the 2025 Whiffin study (Gov. Ex. 5) similarly found that under very specific conditions, an iPhone transported in a vehicle might inaccurately show steps taken, but only when the user holds the phone in their hand during the trip.  (Gov. Ex. 5, pp. 11-12).  During Whiffin's testing, an iPhone transported in a vehicle over the same route but left in a dock did not record any steps.  (*Id.*).  Neither study suggested any other set of circumstances in which false positives were known to occur.

All of this testing and analysis indicates that the Apple Health data at issue is reliable, especially under the circumstances alleged in this case.  The government alleges that Defendant,

under normal walking conditions, walked from his residence, across the street to the arson location, and back to his residence over a period of approximately five minutes. That is the path of travel taken by the person observed on surveillance video during the time of the arson. Defendant denies taking any path of travel to the arson location, instead asserting that he remained in his residence during the relevant time period. There is no claim by either party that Defendant's phone was being transported in a vehicle during that period, or that Defendant was engaging in any other activity that might be expected to result in false positive registrations of steps or distance.

Defendant also argues that the proprietary nature of the algorithms Apple uses to calculate and log Health app data automatically renders such data unreliable. (ECF # 40: Def. Post-Hearing Br., PageID 329-31). But as discussed at the *Daubert* hearing in this case, knowledge of the algorithms underlying the data is not necessary, nor even the best method, to evaluate and confirm the reliability of the data itself. Ms. Hyde testified as such on direct examination:

> **Q** All right. I want to talk now, just briefly, about the argument, that I think you're familiar with, that because Apple Health data is propriety [sic] data, that it's less reliable or unable to be used in digital forensics analysis. Are you familiar with that sort of line of thinking?
>
> **A** Yes.
>
> **Q** Is it accurate to say that the method of data collection by the Health app is propriety [sic] to Apple?
>
> **A** Yes.
>
> **Q** And to your knowledge, is that information known or shared outside of Apple?
>
> **A** I do not know of any instance of Apple publishing that information.
>
> **Q** All right. And, in fact, in certain, perhaps, of the articles that we've talked about today and studies we've talked about today, but certainly others, there have been

efforts made by researchers to figure out how Apple collects that data; is that right?

**A** There have been efforts to figure out how the data is stored and what causes it to be stored.

**Q** Okay. Is that information, that propriety [sic] information, widely known within Apple to its engineers?

**A** I wouldn't have intimate knowledge of that. But I would suppose not since it's such a vast ecosystem. But I have no knowledge of what independent engineers in Apple would know.

**Q** Okay.

**A** I would say, in other instances, Apple has been asked things and not necessarily able to provide answers. But I can't speak to this specifically.

**Q** Can you talk about the difference between raw code, which are the -- well, you tell us.

What is raw code in this scenario, the Apple Health data?

**A** So raw code would refer to Apple's actual programming base of how they wrote the program to function. Right? So the raw code would be the actual operating system and how it functions and how it tells the device it should function.

**Q** And is your knowledge of raw code or the availability of raw code necessary for an accurate and complete forensic analysis of a particular device?

**A** Not at all.

**Q** And is it even helpful in a forensic analysis to have that raw code?

**A** Potentially. But I would never rely upon it. Code is written to do the function it's written to do. It's not written to analyze the traces that are left behind. We can better determine, from a forensics perspective, what traces are left behind because we can test a variety of circumstances.

[After an interruption]

**Q** All right. I'm sorry. You can continue. If you'd like to start your answer over, that might be helpful.

**A** I will. So the raw code would not be as helpful in an analysis because when you're going through raw code, you're going through it in the function in which it was designed. Now we will say that not all documentation of code is good, and

10

you would need to know what external calls go to, so it's a very deep analysis, reverse engineering of that code. However, it is going to do the thing it was designed to do. Right? It's going to function through the thing it was designed to do. The code doesn't think about what other circumstances could cause things to register. So, for example, the digital forensics testing done with shaking the phone or going over the speed bump actually allows us to know more about what traces are left than reading the code. The code is not designed to think about what traces it leaves. The digital forensics artifacts that we examine as digital forensics examiners were not developed for us to be able to analyze these things. The most appropriate way to determine what a piece of trace evidence is is through robust testing and analysis.

**Q** And so, does your lack of knowledge of Apple's propriety [sic] information for the collection and storage of this data make your forensic analysis of Apple Health data less reliable?

**A** No.

**Q** And, in fact, the tools that you used for your forensic analysis are designed to look at artifacts and what data is created as opposed to how it's created; is that right?

**A** That's correct.

**Q** And I think what you've testified to here today is that that is the information that is useful or most useful in a forensic analysis, not necessarily how the program, the Apple Health app, actually collected and stored the data. The fact that the data exists and what the data is, the artifacts are more important than the collection of it; is that right?

**A** The artifacts are more relevant to my area of study and expertise.

(ECF # 38: Hearing Trans., PageID 267-71).

Consistent with Ms. Hyde's testimony, courts have determined that neither *Daubert* nor Rule 702 requires an expert to have knowledge of the algorithms underlying a particular software in order to opine on its reliability.  In *United States v. Morgan*, 45 F.4th 192, 203 (D.C.Cir. 2022), the defendant sought to exclude expert testimony regarding cell phone location data on the ground that the government's expert did not have knowledge of the algorithms used to process the location data for mapping.  Rejecting that argument, the D.C. Circuit observed, "[W]e have never held that Rule 702 requires an expert to have a sophisticated understanding of

the software underlying her technological tools." *Id*.  Explaining the clear fault in such an argument, the court stated, "If we required expert witnesses to have detailed knowledge of the software underlying their testimony, they could almost never testify on matters related to proprietary technology.  For example, 'anyone who testifies using any basic software such as Excel ... to provide financial analysis[ ] would be required to be an expert in the algorithms by which Excel codes its formula and calculations.'"  *Id*. (quoting *United States v. Nelson*, 533 F.Supp.3d 779, 798 (N.D. Ca. 2021)).

Defendant cites a Maryland trial court's ruling in another case in which Ms. Hyde testified in a *Daubert* hearing – *State v. Herrera*, C15-CR-24-000199 (Montgomery Co., Maryland, March 6, 2025) – for the proposition that the proprietary nature of Apple's algorithms should preclude expert testimony regarding the resulting data.  But *Herrera* did not deal with Apple Health data, did not base its exclusion of Ms. Hyde's testimony solely on the proprietary nature of the underlying algorithm, and, in any event, carries little precedential weight for this Court.  Rather, *Herrera* addressed Apple's "significant location history" data.  *Id*. at 2.  After accepting Ms. Hyde as an expert in mobile digital forensics, the court excluded the evidence, noting that, other than one recent peer-reviewed study of such data, "there were no other scholarly articles that specifically speak to significant locations," that the evidence in the record did not address the similarities between the iPhone models used for testing and the model used by the defendant, and that Ms. Hyde did not have access to Apple's proprietary algorithms.  *Id*. at 4-6.

As to the first two findings, the instant case is distinguishable from *Herrera*.  As explained in the government's pre-hearing brief, during Ms. Hyde's hearing testimony in this case, and in this post-hearing brief, multiple scholarly articles, including a peer-reviewed study

12

by a widely accepted expert – van Zandwijk – have been written about the step count, distance, and flights climbed data collected by the Apple Health app.  (*See* Gov. Ex. 3, 4, 5, 6; ECF # 38: Hearing Trans., PageID 247-71).  All of them have found the Health data to be reliable. Likewise, during her testimony, Ms. Hyde explained the difference between the versions of Apple's iOS operating system used for the studies and that of Defendant's iPhone, noting that the iOS versions used for the studies did not have any major differences from Defendant's phone that would make the results unreliable as to the phone in this case.  (ECF # 38: Hearing Trans., PageID 254-56).

At to the court's third finding – that the reliability of the data was affected by Ms. Hyde's lack of access to the proprietary algorithms underlying the data – that conclusion is unsupported by *Daubert* and Rule 702, and is contrary to the rulings of other trial and appellate courts, both state and federal.  *See Morgan*, 45 F.4th at 203; *Nelson*, 533 F.Supp.3d 798; *United States v. Chiaradio*, 684 F.3d 265, 277-78 (1st Cir. 2012) (affirming district court's finding of software's reliability under *Daubert* despite FBI expert's lack of knowledge of program's authors or source code); *State v. Dabate*, 351 Conn. 428, 476-77 (Supreme Court of Conn., March 11, 2025) ("An expert witness does not need knowledge of proprietary information to establish the reliability of data generated by an electronic device.").

Moreover, in making its finding regarding the importance of the proprietary algorithm, the *Herrera* court relied at least in part on a Massachusetts trial court ruling in *Commonwealth v. Arrington*, 493 Mass. 478 (2024) (*Arrington I*).  In *Arrington I*, the Supreme Court of Massachusetts affirmed the trial court's exclusion of expert testimony as to Apple's "frequent location history" data, in small part because the analyst did not have knowledge of Apple's proprietary algorithm used to capture such data.  *Id*., at 492-93.  The primary reasons for the

exclusion were, as in *Herrera* and in contrast to the instant case, a lack of scholarly literature and testing on reliability of the data, and a lack of general acceptance in the scientific community. *Id*. at 492-98.

But the admissibility of the expert testimony in *Arrington* did not end there. After the first trial resulted in a hung jury, the Commonwealth asked the court to revisit its *Daubert* ruling. Upon reconsideration, the court held another hearing, at which Ms. Hyde, Mr. Whiffin, and a third digital forensic examiner testified as experts, and found that the evidence was reliable under *Daubert*. *Commonwealth v. Arrington*, No. 1684CR00824 (Suffolk Superior Ct., April 16, 2026) (*Arrington II*).[2] Among other evidence, the court credited Ms. Hyde's testimony "that the fact that Apple's Frequent/Significant Locations algorithm is proprietary does not undercut the general acceptance of FLH data in the digital forensics community because, in that field, observation and testing is considered the best evidence of how software operates, not the raw code." *Id*., at 13. The same is true in the case before this Court. Given the extensive testing conducted regarding the reliability of Apple Health data, the fact that the algorithm Apple uses to collect and log such data is unknown to the researchers has no bearing on the data's reliability. Defendant has failed to provide any persuasive authority or compelling reasoning to show otherwise.

### C. Rule 403 Does Not Provide a Basis for Excluding the Apple Health Data

As an alternative to his *Daubert* argument, Defendant asks this Court to exclude the Apple Health data extracted from his iPhone because, he contends, such evidence is more

---

[2]    The trial court's opinion in *Arrington II* is attached for the Court's reference as Government Exhibit 7.

prejudicial than probative under Rule 403 of the Federal Rules of Evidence.  This argument is equally without merit and does not support exclusion of the evidence.

"For a Rule 403 violation to occur, the admitted evidence must result in unfair prejudice in that the evidence must suggest a decision on an impermissible basis." *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993) (quotations omitted).  "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." *Id*.

Defendant's Rule 403 argument is mostly a repackaging of his *Daubert* argument, discussed above.  Specifically, Defendant restates his incorrect claim that the data is unreliable and asserts that, because the data is collected by sensors in the iPhone and then processed into a usable form, it "is nothing more than inferences from unknowns[.]" (ECF # 40: Def. Post-Hearing Brief, PageID 333-34).  Indeed, Defendant selects a partial quote from the 2019 van Zandwijk study, purportedly to show that even the author does not believe cell phone data is reliable for forensic purposes.  Defendant recites from the study: "manufacturers are not very explicit about the way these sensor signals are processed, which makes it hard to independently judge the accuracy of health information derived from this sensor information." (*Id*. (quoting Gov. Ex. 4, p. S126)).  But the very next paragraphs, which Defendant omits, set forth the author's belief that with testing and analysis, the data *can* provide valuable forensic evidence.  It states:

> Nevertheless, sizeable amount of processed data are stored in databases by health related apps. The information that is stored varies, but some apps are known to store detailed information with timestamps with a small time granularity. *A good example of this is the Health App*, which is shipped as a system App on iPhones since iOS 8. During the day, the Health App automatically collects data on number of steps taken, traveled distances and number of floors climbed which is stored in periods of a couple of minutes.

From a forensic perspective, such detailed information on (physical) user activity can, of course, be very valuable for investigative and evidential purposes.

(Gov. Ex. 4, pp. S126-27) (emphasis added).

Defendant also attempts to use his proprietary algorithm argument to claim that, "[b]ecause nobody understands exactly how the Apple Health App data is collected," admitting such data as evidence is unfairly prejudicial and would mislead the jury. (ECF # 40: Def. Post-Hearing Br., PageID 334). For the same reasons it fails under the *Daubert* analysis, this argument does not support exclusion under Rule 403. That is, because the reliability of the data has been shown through testing, the proprietary nature of Apple's algorithm is irrelevant. There is no danger of misleading the jury by presenting reliable information.

Rule 403 does not warrant exclusion of the Apple Health data in this case. Such evidence is clearly relevant, as it tends to prove that Defendant was the person seen in surveillance video walking to the arson location at the time of the fire. That probative value, while significant, is not outweighed by a danger of unfair prejudice. Indeed, given the reliability of Apple Health data and the other evidence corroborating the accuracy of the data in this particular case (e.g., video of Defendant's known movements before and after the fire), there is nothing unfair about the jury receiving the Apple Health data evidence. Defendant will have an opportunity for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[,]" all of which the *Daubert* court recognized as the appropriate means of challenging evidence. *Daubert*, 509 U.S. at 596; *see In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 532 (6th Cir. 2008) (affirming district court's determination that party's attacks on expert's testimony "were most appropriate for cross-examination[,]" not exclusion under Rule 403).

**D.  CONCLUSION**

Based upon the foregoing, the United States respectfully requests that this Court deny

Defendant's motion to exclude expert testimony pursuant to Rule 702 and *Daubert*.


Respectfully submitted,

DAVID M. TOEPFER
United States Attorney


/s/ Peter E. Daly
Peter E. Daly  (OH: 0084745)
Assistant United States Attorney
Federal Building
2 South Main Street, Room 208
Akron, OH 445308
(330) 761-0529
Peter.Daly@usdoj.gov

17